Argued and submitted July 24, 2000, affirmed April 10, 2002

John E. SMITH;
Robin Sherwin; Timothy M. Bowman;
Marsha Cordon; Anthony W. Furniss;
Marvin J. Garland; David N. Hobson, Jr.;
Carol Jones; John D. Peterson; and Andrew M. Rich,
*Appellants,*

*v.*

WASHINGTON COUNTY;
Olympic Security Services, Inc.,
a Washington corporation;
and the Hon. Gayle A. Nachtigal,
*Respondents.*

C98-0531CV; A106905

43 P3d 1171

Andrew M. Rich argued the cause and filed the briefs for appellants.

William G. Blair, Senior Assistant County Counsel, argued the cause for respondents Washington County and Olympic Security Services, Inc. With him on the brief was Dan R. Olsen, County Counsel.

Jas. J. Adams, Assistant Attorney General, argued the cause for respondent The Hon. Gayle A. Nachtigal. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Linder, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

LINDER, P. J.

## LINDER, P. J.

Plaintiffs brought this action seeking a declaration that certain security procedures implemented as a condition of entry into the Washington County court facilities, together with the order of the presiding judge authorizing those procedures, violate Article I, section 9, of the Oregon Constitution. The trial court granted defendants' motion for judgment on the pleadings pursuant to ORCP 21 B, concluding that, under the allegations of the complaint, the challenged procedures are constitutional. Plaintiffs appeal from the resulting judgment, primarily challenging the grant of defendants' motion for judgment on the pleadings. We conclude that, based on the allegations of the complaint, the security searches are constitutional. We therefore affirm.

■ We review the trial court's disposition of the motion for judgment on the pleadings to determine whether the "allegations in the pleadings affirmatively show that plaintiffs cannot prevail as a matter of law." *Withers v. State of Oregon*, 133 Or App 377, 382, 891 P2d 675, *rev den* 321 Or 284 (1995). In that regard, we accept the following well-pleaded allegations of fact in plaintiffs' complaint as true. *Slogowski v. Lyness*, 324 Or 436, 439, 927 P2d 587 (1996).

Plaintiffs are citizens of the State of Oregon who, from time to time, enter the courthouse and Justice Services Building located in Hillsboro, Oregon, for a variety of reasons, including to transact business. Defendants are Washington County (the county), a municipal corporation and county government in the State of Oregon; Olympic Security Services, Inc. (Olympic), a Washington corporation; and the Honorable Gayle A. Nachtigal (Judge Nachtigal), the "Presiding Judge of the Circuit Court of the State of Oregon for Washington County."[1]

Plaintiffs' complaint sets forth two claims. In the first, the key allegations are these: Pursuant to a contract

---

[1] Throughout this opinion, we use the term "defendants" to refer collectively to the county, Olympic, and Judge Nachtigal.

between the county and Olympic, security searches for weapons and contraband are conducted of all people who enter the courthouse complex buildings, except employees and certain others who are exempted from the search policy by Judge Nachtigal. The contract between the county and Olympic "was drafted by, is administered by[,] and is subject to modification and amendment by the Washington County Sheriff's Office." "[A]ll but specifically excepted persons entering the Courthouse complex, in the absence of probable cause, reasonable suspicion, or any other lawful or constitutional justification or basis, are seized, stopped, detained and subjected to intrusive and extensive searches[.]" Individuals are required "to walk through highly sensitive electronic magnetic devices which are activated by small amounts of metal"; to submit their belongings, briefcases, and other parcels to employees of Olympic, who use x-ray machines and conduct hand searches of their persons, effects, and clothing; and "to hand over for inspection all belongings and garments as demanded by Olympic employees." If a person seeking entrance to the courthouse refuses to consent to the conduct as described above, Olympic employees instruct that he or she may not enter. If the person enters contrary to such an instruction, Washington County deputy sheriffs are summoned to order that person to leave the courthouse on pain of arrest for criminal trespass.[2] As part of their first claim for relief, plaintiffs specifically allege that the contract between the county and Olympic, pursuant to which the security procedures are performed, "is not the legislative product of a politically accountable body."

Plaintiffs' second claim for relief is aimed at the judicial order directing that the security procedures be implemented. In that claim, the key allegations are these: Judge Nachtigal "issued and filed 'General Order 130' requiring and ordering that all but specifically excepted persons submit

---

[2] The allegations as to what occurs when a person refuses to submit to the security procedures do not appear in the amended complaint as it was originally drafted. Rather, they are a consequence of a stipulation of the parties that was accomplished in the course of the hearing on defendants' motion for judgment on the pleadings. On the basis of that stipulation, the parties and the trial court treated the complaint as having been "amended" by the addition of those allegations, as do we.

their persons and belongings to seizure and search upon command by the employees of Olympic Security Services, Inc." The order was issued "without an affidavit alleging facts amounting to probable cause or a hearing from which a court might find probable cause," "describes no particular individual to be searched," and requires "all persons, other than those specifically excepted by the Presiding Judge, to submit themselves and their belongings to seizure and search by persons who are not commissioned law enforcement officers upon other than individualized suspicion and without probable cause." The order is a " 'general search warrant' " and is "unlawful and in violation of [the] Oregon Constitution including the provisions of Article I, [s]ection 9."

On the basis of those allegations, plaintiffs sought declaratory and injunctive relief. In particular, they requested a judgment:

"1.  Declaring the conduct and practices of the Defendants Olympic Security Services, Inc., and Washington County, and The Hon. Gayle A. Nachtigal, and each of them, as set forth above to be unlawful and in violation of the provisions of the Oregon Constitution; and

"2.  Permanently enjoining and prohibiting Defendants Olympic Security Services, Inc., Washington County, and The Hon. Gayle A. Nachtigal from any and all stopping, detaining, searching and seizing of citizens without individualized suspicion and probable cause consistent with the provisions of the Oregon Constitution, including Article I, [s]ection 9; and

"3.  Declaring 'General Order 130' to be unlawful and in violation of the provisions of the Oregon Constitution, including Article I, [s]ection 9; and

"4.  Permanently enjoining the Hon. Gayle A. Nachtigal, Washington County, and Olympic Security Services, Inc. from further enforcing or in any way seeking to have others enforce the terms and directives of 'General Order 130'; and

"5.  For the costs and disbursements incurred herein."

In their amended answers, defendants denied many of plaintiffs' allegations, and they pleaded four affirmative defenses: (1) plaintiffs have an adequate remedy at law; (2) there is no justiciable controversy; (3) plaintiffs lack standing; and (4) the court should exercise its discretion to deny the complaint because it is overly broad. Judge Nachtigal moved for judgment on the pleadings based on the first two affirmative defenses, and the county and Olympic orally joined that motion. Judge Nachtigal also moved for summary judgment, arguing, among other points, that the searches were constitutional as a matter of law because they were either valid administrative searches or were based on the consent of persons entering the courthouse. The motion for judgment on the pleadings incorporated the memorandum that Judge Nachtigal filed in support of the motion for summary judgment, thus effectively expanding the legal grounds for the motion for judgment on the pleadings to include the arguments that the searches were valid as administrative or consent searches.

At the hearing on that motion, the parties and the court focused primarily on defendants' assertion that, under *State v. Brownlie*, 149 Or App 58, 941 P2d 1069 (1997), the search procedures as described in the complaint are constitutional because they are conducted pursuant to consent. The trial court agreed with that proposition and granted defendants' motion for judgment on the pleadings. In its judgment, the trial court declared that "[t]he actions of defendants Washington County and Olympic Security Services, Inc. in establishing the perimeter security system described in plaintiffs' complaint do not violate the Oregon Constitution." The trial court also declared that "Presiding Judge Gayle A. Nachtigal's 'General Order 130' is not a general search warrant and does not violate the Oregon Constitution, including the provisions of Article I, section 9."

On appeal, plaintiffs' primary challenge is to the trial court's ruling that the searches described in their complaint do not violate Article I, section 9.[3] Plaintiffs argue that

---

[3] Plaintiffs do not argue that it is inappropriate to resolve their administrative search challenge through the procedural mechanism of judgment on the pleadings. To the contrary, they assert only that consent was not appropriately resolved

the courthouse security procedures cannot be justified on the basis of consent, because "[p]laintiffs expressly do not consent to being searched" and "[a]ny consent that is implied by application of *Brownlie* * * *, is the produc[t] of coercion and not an act of free will." Alternatively, plaintiffs argue that, because no statute explicitly provides for courthouse security searches and because neither General Order 130 nor the contract was properly authorized, the search s were not valid administrative searches. In response, c fendants renew their reliance on the decision in *Brownlie,* sserting that the allegations of the complaint establish as a matter of law that the security searches are performed pursuant to implied consent. Defendants also argue in the alternative that the searches are valid administrative searches because they are authorized by a politically accountable body.

We begin with the question of whether the security search practices or procedures, as alleged, are constitutional as justified by consent. In that regard, both parties are partly right in the positions that they take. Defendants are correct that consent can be implied in circumstances in which the person submitting to a search is doing so because he or she is faced with an unpleasant choice—such as the choice between entering the courthouse or not entering it or having to leave certain possessions outside. *See, e.g.*, *State ex rel Juv. Dept. v. Stephens*, 175 Or App 220, 27 P3d 170 (2001). At the same time, plaintiffs are correct that consent to a search must be voluntary and the product of free will. *State v. Parker*, 317 Or 225, 230, 855 P2d 636 (1993). At that juncture, the parties' positions reach an impasse, with defendants arguing that submission to the search procedures as alleged would be impliedly consensual and plaintiffs arguing that any such consent is coerced because they are forced to submit as a condition of entering the courthouse.

The solution to that impasse lies in analyzing the circumstances in which the government lawfully can put a citizen to such a choice, which is an analysis neither party makes. Thus, both parties' arguments are correct as far as

through judgment on the pleadings and expressly invite us to "turn, instead, to the issue of whether courthouse searches are legitimate administrative searches" under prevailing state constitutional principles. For reasons detailed later in the opinion, we take that approach.

they go, but they do not go far enough. We recently reviewed the controlling principles in *Stephens*, a case involving a warrantless search of a high school student's locker. There, as a condition of voluntarily attending an alternative public school following his expulsion from a regular public school, the student and his mother were required by school policy to agree to random searches of his school locker. In concluding that the student consented to the searches, we observed:

> "Youth's argument is only that his consent was not the product of his free will and was, instead, a result of express or implied coercion. But the fact that consent derives from a difficult or unpleasant choice is not enough to render it involuntary. Youth's situation in this case is analogous to that of other circumstances where, in exchange for a desired benefit, a citizen must agree to a search of his or her person or belongings. *See, e.g., Brownlie*, 149 Or App at 63 (inferring consent to x-ray screening of a defendant's purse from her conduct in placing it on a conveyor belt at courthouse); *State v. Kelsey*, 67 Or App 554, 679 P2d 335 (1984) (holding that, by attempting to board an airplane, the defendant impliedly consented to a preboarding search at terminal gate). The circumstances here also are akin to those of a defendant who consents to a search when advised by police that they have probable cause to obtain a search warrant and will do so if consent is declined. There, as here, a defendant is confronted with the reality of *what the law permits government officials to do if consent is refused. The decision whether to consent, when made in the face of such a legal reality, is not enough, in and of itself, to render the consent involuntary for constitutional purposes. See, e.g., State v. Rodal*, 161 Or App 232, 242, 985 P2d 863 (1999)."

*Stephens*, 175 Or App at 226-27 (emphasis added).

■       As that passage demonstrates, valid "consent" occurs when a citizen submits to a search rather than face a disagreeable alternative *if* the choice to which the government puts the citizen is itself lawful. Thus, in this case, the validity of any consent implied from a citizen's decision to submit to a search as a condition of entry into the courthouse turns on whether the government lawfully implemented the security procedures as an administrative search.

In that regard, the decision in *McMorris v. Alioto*, 567 F2d 897 (9th Cir 1978), which involved an analogous challenge, is instructive. There, as here, a judge issued an order requiring citizens entering a San Francisco courthouse to pass through a metal detector as a condition of entry into the building. Briefcases and parcels were also inspected, but those conducting the search were instructed not to examine written material. If the device was activated, the person could either leave or submit to further search procedures. *Id.* at 899. An attorney brought a civil rights action, alleging that the courthouse security searches violated his constitutional right to be free of unreasonable searches and seizures. In rejecting his claim, the court first examined whether the security searches were valid regulatory searches (*i.e.*, administrative searches) pursuant to the applicable federal analysis. After concluding that "[t]he procedures used were therefore appropriate in this case," *id.* at 900, the court further examined the requirement that persons submit to the searches as a condition of entry into the courthouse. We quote from the decision at some length, because it reveals how consent in such a setting is dependent on the administrative search analysis:

> "Even where the necessity of a limited regulatory search has been established and the manner of conducting the search has been found reasonable, we have sustained such searches only where persons subject to the search have given what we have termed 'implied consent.' In this case, McMorris insists that he did not consent to the searches at the Hall of Justice: He seeks a declaration that the procedures are unlawful. He attempts to distinguish cases upholding analogous searches at airline terminals on the ground of consent by pointing out that in this case, he is either compelled to submit to the search at the Hall of Justice or required to forego the practice of law and risk being found in contempt of court for failing to appear at those proceedings in which he is attorney of record.

> "We acknowledge that persons entering the Hall of Justice do not consent to the search in the full and generally accepted meaning of that term. Nor do we doubt that their consent in these circumstances would be insufficient to constitute the voluntary consent, frequently motivated by a

desire to cooperate with law enforcement officials, necessary to validate a warrantless, full-scale search for evidence of a crime. Nevertheless, the limited regulatory search challenged here is performed only after the individual seeking to enter the courthouse has consented, as that term is used in our previous decisions upholding limited searches. Persons entering the Hall of Justice are not physically coerced to submit to the magnetometer search or the briefcase and parcel inspection. They may leave the premises at any time, even after activating the magnetometer. They are apparently given more than one opportunity to pass through the magnetometer. Finally, even after activating the device, a person may not be subjected to a pat-down search unless he fully and voluntarily agrees to it. He is under no compulsion to submit.

"The requirement that a person give this qualified consent to the search strictly circumscribes the state's authority and validates the limited intrusion at issue here. Air travel, for many persons today, is all but a necessity. Nevertheless, we have held that passengers must consent to a limited magnetometer search before boarding an airplane. The situation here is not significantly different. Although an attorney's consent to a search is exacted as the price of entering the courthouse to discharge duties necessary to his profession, the search is nevertheless consensual in the same way as in the airport search cases. The regulatory search in this case was therefore consistent with fourth amendment principles[.]"

*Id.* at 900-01 (citations and footnotes omitted).[4]

■      In sum, the issue of implied consent does not trump plaintiffs' challenge to the county's authority to adopt and implement administrative security searches. Here, given the

---

[4] Other courts have similarly considered the validity of the administrative search procedures as a predicate to a conclusion that persons submitting to those procedures as a condition of entry impliedly consent to be searched. *People v. Troudt*, 5 P3d 349, 351 (Colo Ct App 1999) (holding that a particular search involving x-ray examination of parcels and magnetometer inspections of individuals who seek to enter the courthouse was valid because "the evidence and statements at issue were obtained as the result of a lawful administrative search to which defendant voluntarily consented"); *see also State v. Rexroat*, 266 Kan 50, 966 P2d 666 (1998) (similar analysis); *State v. Plante*, 134 NH 585, 594 A2d 165, *cert den* 502 US 984 (1991) (same).

allegations of the complaint, and at least in terms of the facial validity of the procedures, a citizen's decision to submit to the courthouse security procedures rather than leave the courthouse is a valid basis to imply consent only *if* plaintiffs' challenge to the county's authority to implement the security procedures fails. Said another way, to imply consent from the circumstances alleged, a court must conclude that the security procedures result in lawful administrative searches, which is the predicate for the conclusion that government is lawfully putting the citizen to what some may view as an unpleasant choice of submitting to the search as a condition of entry.

Thus, defendants' reliance on *Brownlie* as a complete answer to plaintiffs' challenge is misplaced. *Brownlie* involved a criminal prosecution that arose after the defendant had placed her purse on the conveyor belt of an x-ray machine and, as a result of the x-ray, police searched inside the purse and found contraband. We described the issue as "narrowly confined to the legality of the x-ray screening *of defendant's purse."* *Brownlie,* 149 Or App at 62 (emphasis added). The issue was so confined because the defendant in *Brownlie* did not challenge the lawfulness of the implementation of courthouse security procedures generally. Rather, in presenting her argument to this court, she expressly assumed the facial validity of a policy of screening for weapons.[5] In light of that, we analyzed only the validity of that particular search of that particular defendant's purse. *Id.* at 62-63. We did not examine the authority for or lawfulness of the courthouse security procedures generally, because that issue was not raised by the defendant's challenge.

Here, in contrast, that is the precise issue raised by plaintiffs' challenge. Where, as here, the validity of the search procedures is challenged on the ground that they are not authorized by a politically accountable body, it begs the question to answer that challenge by asserting that the procedures necessarily result in valid implied consent. Any such consent is itself dependent on the government's authority to require submission to the administrative search procedures.

---

[5] We make that observation based on our review of the defendant's brief in *Brownlie.*

In other words, consent in this context does not provide an alternative ground on which to uphold the validity of search procedures, because the validity of those procedures is itself a predicate to a conclusion that entry into the courthouse can be conditioned upon submission to the searches. We therefore turn to the issue that the parties treat as an "alternative" ground of decision but that is, instead, the analysis necessary to resolve plaintiffs' challenge—*i.e.*, whether the courthouse search procedures as described in plaintiffs' complaint are valid under applicable administrative search principles.

Article I, section 9, of the Oregon Constitution, provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Pursuant to that guarantee, "[a]ny intrusion of state power upon a constitutionally protected interest, be it for civil or criminal investigative purposes, must comply with constitutional standards." *State v. Bridewell*, 306 Or 231, 239, 759 P2d 1054 (1988). But the standards that apply differ, depending on the purpose of the search.

**5-8.** An administrative search is one conducted "for a purpose other than the enforcement of laws by means of criminal sanctions." *State v. Anderson*, 304 Or 139, 141, 743 P2d 715 (1987). Among other requirements, an administrative search must be properly authorized, which means that politically accountable officials, through laws, ordinances, or delegations of rulemaking authority, have engaged in the predicate policy-making choice to take such action. *State v. Atkinson*, 298 Or 1, 6, 8, 688 P2d 832 (1984).[6] Such authorization need

---

[6] *See also State v. Holmes*, 311 Or 400, 404 n 4, 813 P2d 28 (1991) ("Potential sources of proper authorization by politically accountable lawmakers would include, for example, a statute enacted by the Oregon Legislature or by the electorate through the initiative or referendum process, a regulation based on a statute, a city or county charter provision, a city or county ordinance, or a policy or procedure promulgated pursuant to authority.").

not be explicit but can be implied. *See State v. Boone,* 327 Or 307, 314, 959 P2d 76 (1998) (authority to conduct inventory of a car was implied from explicit authorization to impound granted by city ordinance); *State v. Ketelson,* 163 Or App 70, 986 P2d 1202 (1999) (the authority to conduct inventory at a detoxification center can be implied from the decision by a politically accountable body to establish the center). Nor must the politically accountable body itself conceive of, design, and authorize every aspect of the search procedures. Rather, that body's role can be limited to one of authorizing the policy to search, while leaving the details of implementation to the agency or entity charged with executing the searches. *See Boone,* 327 Or at 314 (reasoning that the politically accountable body need not adopt the implementation procedures).

■     With those principles in mind, we turn to plaintiffs' challenge to the lawfulness of the courthouse search procedures in light of the allegations in their complaint. In that regard, it is well to keep in mind that this is a civil declaratory judgment action, not a criminal case. Were it the latter, the government would have the burden of demonstrating the lawfulness of the search procedures, if challenged. *State v. Barnes,* 172 Or App 408, 412, 18 P3d 1108 (2001). But because this is a civil declaratory judgment action, "plaintiff[s have] the burden of demonstrating claimed illegalities." *Nelson v. Lane County,* 304 Or 97, 101, 743 P2d 692 (1987); *see also AFSCME Local 2623 v. Dept. of Corrections,* 315 Or 74, 83, 843 P2d 409 (1992) (declaration of validity of agency rules authorizing administrative searches is limited to the specific theories advanced by the petitioners). Necessarily, then, plaintiffs have the burden of pleading those illegalities in their complaint and, through that pleading, framing the issues for resolution.

■     Here, the gravamen of plaintiff's allegations is that the alleged searches are not valid administrative searches because neither the contract nor General Order 130 is a proper source of authority for the search procedures. Consequently, according to plaintiffs, the searches violate Article I, section 9. Thus, our administrative search analysis begins and ends with the claimed illegality in this case—the

challenged searches are "not the legislative product of a politically accountable body."[7] To determine whether the courthouse search procedures were properly authorized by a politically accountable body, we examine the authority that the legislature has provided to the Chief Justice of the Supreme Court and to the presiding judges of the judicial districts of this state.[8]

Although Article VII (Original), section 5, of the Oregon Constitution, establishes the office of the Chief Justice of the Supreme Court, it does not specify the Chief Justice's duties. Under ORS 1.002(1), however, the Chief Justice is designated as the "administrative head of the judicial department" and is charged with exercising *administrative authority and supervision* over the courts of this state consistent with applicable provisions of law and the Oregon Rules of Civil Procedure." (Emphasis added.) The statutes that apply to the presiding judges of the judicial districts confer complementary authority at the local level. Specifically, ORS 1.002(5) provides, in relevant part:

> "The Chief Judge of the Court of Appeals and the presiding judge of each judicial district of this state are the administrative heads of their respective courts. They are responsible and accountable to the Chief Justice of the

---

[7] As in *Nelson* and *AFSCME Local 2623*, our resolution is limited to the specific theory of invalidity advanced by petitioners in their complaint. Thus, we do not decide the validity of the security procedures as applied in individual cases, or other theories on which the procedures might be subject to facial challenge.

[8] Our analysis in this case should not be understood to implicitly hold that the judiciary necessarily must depend on the legislature, a coequal branch of government, for its authority to provide for the safety of courthouse facilities. Other courts have upheld challenges to the judiciary's power to impose courthouse security searches on the basis of inherent authority. *See, e.g., State v. Wadsworth*, 139 Wash 2d 724, 991 P2d 80 (2000) (reasoning that the court had inherent authority to administer justice and provide for courthouse security); *Bd. of Com'rs, Weld Co. v. 19th Jud. Dist.*, 895 P2d 545 (Colo 1995) (concluding that Chief Judge's order requiring compliance with the Sheriff's recommendations for courthouse security was properly within the court's inherent powers). *See generally Ortwein v. Schwab*, 262 Or 375, 385-86, 498 P2d 757 (1972), *aff'd* 410 US 656, 93 S Ct 1172, 35 L Ed 2d 572, *reh'g den* 411 US 922, 93 S Ct 1551, 36 L Ed 2d 315 (1973) ("We look upon the doctrine of inherent judicial power as the source of power to do those things necessary to perform the judicial function for which the legislative branch has not provided, and, in rare instances, to act contrary to the dictates of the legislative branch."). Because we conclude that statutes provide the necessary authority in this instance, we need not examine whether inherent authority might also justify the searches.

Supreme Court in the exercise of their *administrative authority and supervision* over their respective courts."

(Emphasis added.) The statute expressly authorizes the Chief Justice to make rules and issue orders to facilitate the exercise of his or her statewide responsibilities of administration and supervision. *See generally* ORS 1.002(1). Likewise, the presiding judges may, by rules and orders, exercise their local administrative and supervisory authority. ORS 1.171(2)(b). The administrative directives of the Chief Justice, however, have primacy. That is, all rules or orders issued by presiding judges or, for that matter, any other judge, "relating to the conduct of the business of the court shall be consistent with applicable rules made and orders issued by the Chief Justice." ORS 1.002(4).

The statute providing for the Chief Justice's implementation of his or her supervisory and administrative authority does so in both specific and general terms. Under ORS 1.002(1)(a), the Chief Justice may, as just described, "[m]ake rules and issue orders appropriate to [the] exercise [of administrative authority and supervision]." The subsections that follow that grant of authority specify in some detail directives that the Chief Justice may issue relating to personnel, productivity, budget, and similar issues concerning the state wide management of the business of the courts.[9]

---

[9] Specifically, ORS 1.002(1) provides, in part, that "to facilitate exercise of that administrative authority and supervision," the Chief Justice may:

"(a) Make rules and issue orders appropriate to that exercise.

"(b) Require appropriate reports from the judges, other officers and employees of the courts of this state and municipal courts.

"(c) Pursuant to policies approved by the Judicial Conference of the State of Oregon, assign or reassign on a temporary basis all judges of the courts of this state to serve in designated locations within or without the county or judicial district for which the judge was elected.

"(d) Set staffing levels for all courts of the state operating under the Judicial Department and for all operations in the Judicial Department.

"(e) Establish time standards for disposition of cases.

"(f) Establish budgets for the Judicial Department and all courts operating under the Judicial Department.

"(g) Assign or reassign all court staff of courts operating under the Judicial Department.

"(h) Pursuant to policies approved by the Judicial Conference of the State of Oregon, establish personnel rules and policies for judges of courts operating under the Judicial Department."

Finally, and significantly, ORS 1.002(1)(i) provides that the Chief Justice may "[t]ake any other action appropriate to the exercise of the powers specified in this section and other law, and appropriate to the exercise of *administrative authority and supervision* by the Chief Justice over the courts of this state." (Emphasis added.)

The Uniform Trial Court Rules (UTCR) are one means by which the Chief Justice has implemented his administrative and supervisory authority over the courts of the state. *See Coleman and Coleman,* 117 Or App 333, 335, 844 P2d 234 (1992) (stating that the UTCR were issued under ORS 1.002(1)(a)). As pertinent to this case, the Chief Justice has, by rule, prohibited persons from bringing into court facilities weapons and other items that threaten the safety of the participants and the public in judicial proceedings and other courthouse business. In particular, UTCR 6.180 provides:

> "Unless otherwise ordered by the court, no person except a law enforcement officer shall possess in a court facility a firearm, knife, device, or hazardous substance capable of inflicting death or physical injury."

To enforce that UTCR and in furtherance of the policy of courthouse safety that it embodies, Judge Nachtigal issued General Order 130, *i.e.,* the order that plaintiffs challenge in this case. It provides, in part:

> "NOW THEREFORE IT IS ORDERED that the Washington County Sheriff, or others acting under his direction, until otherwise ordered by the Court shall enforce UTCR 6.180 by every lawful means, including searches of an individual's person and carried items and seizure of weapons and hazardous substances, to prevent any person from entering or being within any court facility with any items pr[o]scribed from possession in a court facility by UTCR 6.180. In carrying out any search under this order, law enforcement officers or others acting under the Sheriff's direction shall not examine the written content of any documents observed and may not testify to the content of any written document encountered solely through such a search.

"IT IS FURTHER ORDERED that any person entering any court facility as defined in this order shall submit to a search of their person and a search of their bags, briefcases, valises, and hand carried items for purposes of insuring compliance with UTCR 6.180. Refusal of a person to submit to a search as provided by this order shall result in removal of the person from the court facility."

As earlier described, to comply with that order, the county, through the oversight of the county sheriff, contracts with Olympic to conduct the security searches.

Thus, the precise question presented by plaintiffs' challenge to General Order 130 and to the search procedures as not authorized by a politically accountable body is whether the legislature's grant of "administrative and supervisory authority" to the Chief Justice and presiding judges encompasses the authority to provide for courthouse security.[10] The legislature has not, in express terms, directed or authorized the Chief Justice or presiding judges to exercise authority to that specific end. But it does not have to. As earlier discussed, authorization by a politically accountable body can be implied. *See, e.g., Boone,* 327 Or at 314. Here, we conclude that statutes implicitly provide such authorization.

We reach that conclusion primarily based on the literal meaning of the phrase "administrative authority and supervision." *See PGE v. Bureau of Labor and Industries,* 317 Or 606, 610, 859 P2d 1143 (1993) (first step in statutory interpretation is to examine text). Those terms, by definition, are broad in their scope. As ordinarily understood, administrative authority encompasses the full range of management

---

[10] Plaintiffs assert, but only in passing, that "Judge Nachtigal's General Order is really nothing but a local rule promulgated and enforced contrary to statute and the [UTCR]." If plaintiffs' point is that the order is unauthorized because it is in the wrong form, we disagree. The pertinent statutes do not confine a presiding judge to issuing rules in some instances and orders in others. Nor do we understand the UTCR to do so, especially in circumstances not limited to compliance by parties and attorneys. *See* UTCR 1.050(1)(b) ("A court must incorporate into its [supplementary local rules] any local practice, procedure, form or other requirement ('local practice') with which the court expects or requires parties and attorneys to comply.").

and executive policy choices involved in ensuring that an organization or institution can serve its mission.[11] That understanding of the language is underscored by context. In particular, the legislature granted the Chief Justice the authority to "[t]ake *any other action* appropriate to the exercise of the powers specified in this section and other law, and appropriate to the exercise of administrative authority and supervision by the Chief Justice over the courts of this state." ORS 1.002(1)(i). The broad scope of authority granted to the Chief Justice in that regard is significant in determining what powers are implicit in the grant. *See Boone*, 327 Or at 312-13.

The crux of the issue thus is whether "administering" a court system reasonably entails providing for the security of the courthouse facility itself. The answer is yes, because the effective functioning of courts of the state is served by preventing people from entering courthouse facilities with hazardous substances and weapons. Not surprisingly, plaintiffs do not argue that the security of the courthouse is unrelated to the effective functioning of the court system. Nor would we agree with such an argument. As the Supreme Court of Colorado has aptly recognized, if courts are to serve as open forums for the resolution of legal conflicts, the participants and the public must feel safe to enter and remain inside:

"[T]he Chief Judge properly ordered security to ensure the continuing viability of the courts. Without security the public's confidence in the integrity of the judicial system is threatened. The proper administration of justice requires that courts operate in a safe and secure environment. When

---

[11] "Administrative" means "of, belonging to, proceeding from, or suited to administration or an administration." *Webster's Third New Int'l Dictionary*, 28 (unabridged ed 1993). In turn, the definitions of "administration" include "performance of executive duties : management, direction, superintendence" and "the principles, practices, and rationalized techniques employed in achieving the objectives or aims of an organization[.]" *Id. Black's Law Dictionary*, 44 (7th ed 1999), indicates that "administrative" is the adjectival form of "administration," which may be defined as "[t]he management or performance of the executive duties of a government, institution, or business." The definitions of "authority" include "delegated power over others : authorization[.]" *Webster's Third New Int'l Dictionary* at 147. Finally, "supervision" means "the act, process, or occupation of supervising : direction, inspection, and critical evaluation : oversight, superintendence[.]" *Id.* at 2296.

society views the security of the court system with skepticism, the authority of the judicial branch is diminished. A weak judicial branch prevents a proper functioning of the tripartite scheme of government. The Chief Judge properly ordered security so the courts may continue to fulfill their constitutional mandate and administer justice in an orderly and dignified atmosphere."

*Bd. Of Com'rs, Weld Co. v. 19th Jud. Dist.*, 895 P2d 545, 548-49 (Colo 1995). The Colorado Supreme Court concluded in that case that courthouse security interests were sufficiently integral to the effective functioning of the judicial branch that implementing security searches was a matter within the judiciary's inherent authority. Significantly, that court likewise has concluded that preserving the security of a courthouse also falls within a grant of judicial *administrative* authority. *People Ex Rel. Sullivan v. Swihart*, 897 P2d 822 (Colo 1995) (local chief judge's prohibition of weapons on one floor of the courthouse was a valid exercise of the general administrative authority delegated to him by the state's Chief Justice).

We therefore conclude that Judge Nachtigal's order, which complemented and effectuated UTCR 6.180, was within her statutory administrative authority. Both the Chief Justice and the presiding judges of the judicial districts are vested with broad administrative, supervisory, and management authority. Providing for courthouse security comes well within the ambit of such authority.[12] The challenge to Judge Nachtigal's order and to the search procedures, as framed by plaintiffs' pleadings, therefore fails. We agree that,

---

[12] A number of other statutory provisions rest on the assumption that the judiciary has authority to create courthouse security measures. For example, ORS 1.180 allows the presiding judge of a judicial district to appoint an advisory committee to address courthouse security. Under that statute, the committee shall develop a security plan that may include recommendations concerning various facets of security, from emergency alarm systems and evacuation to the transportation and supervision of prisoners for court appearances. ORS 1.180(3). The adoption of the plan is subject to the presiding judge's approval. ORS 1.180(5). Additionally, ORS 1.182 provides a mechanism by which the security plan can be funded. Significantly, ORS 1.180 does not require that the presiding judge address security concerns exclusively through appointment of a committee; instead, the language is permissive. ORS 1.180(1) ("The presiding judge for a judicial district *may* appoint an Advisory Committee on State Court Security for the judicial district.") (emphasis added). Nothing in that statute suggests that the presiding judge lacks authority to address security through other means.

based on the allegations of plaintiffs' complaint, defendants were entitled to judgment as a matter of law.[13]

Affirmed.

---

[13] After the trial court granted the motion for judgment on the pleadings, plaintiffs moved to amend their complaint to plead expressly their status as attorneys transacting business and witnesses and persons attending trials and hearings open to the public who do not "voluntarily consent" to the courthouse security searches. The trial court denied the motion, reasoning that the amendment would add nothing because the court had not concluded that any consent to the searches was voluntary in the sense that it was the product of free will, as plaintiffs argued it must be. Rather, the trial court's ruling was that, under the facts alleged in the complaint, persons submitting to the search procedures impliedly consented to do so as a matter of law. Plaintiffs' second assignment of error challenges the trial court's denial of their motion to amend. We agree with the trial court's reasoning that, given the basis for its ruling, the allegations that plaintiffs wanted to add to their complaint would not have altered the outcome. *See Slogowski v. Lyness*, 324 Or 436, 439, 927 P2d 587 (1996) (motion to amend should be liberally granted *if* amendment would preclude the entry of such a judgment). The trial court therefore did not abuse its discretion in denying the motion to amend. *See* ORCP 25 A (giving trial court permissive, not mandatory, authority to allow motion to amend pleadings following a grant of judgment on the pleadings). In all events, on appeal we have gone beyond the trial court's consent rationale and have resolved the question of whether the security procedures are properly authorized. Because that is the essential issue framed by plaintiff's complaint and the amendment would not have raised any further challenge, plaintiffs cannot claim any prejudice in light of our resolution of the appeal.