Argued and submitted March 18, affirmed on appeal and cross-appeal
October 23, 2002

# John WEBER
## and Shannon Weber,
### Guardians ad litem for Ginelle Weber, a Minor,
*Appellants - Cross-Respondents,*

*v.*

# OAKRIDGE SCHOOL DISTRICT 76,
*Respondent - Cross-Appellant.*

## 16-00-21584; A114141

56 P3d 504

Thomas M. Christ, ACLU Foundation of Oregon, Inc., argued the cause and filed the reply brief and answering brief on cross-appeal for appellants - cross-respondents. With him on the opening brief was Todd S. Baran.

Timothy R. Volpert argued the cause for respondent - cross-appellant. With him on the briefs were Katrina M. Lonborg and Davis Wright Tremaine LLP.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

LANDAU, P. J.

Schuman, J., concurring.

**LANDAU, P. J.**

Oakridge School District 76 (the district) adopted a drug-testing policy requiring all students who wish to participate in extracurricular school athletics to consent to random urinalysis testing throughout the school year and to disclose any use of prescription medications. Ginelle Weber, a student at Oakridge High School, tried out for and made the school's volleyball team. But she and her parents refused to consent to the random urinalysis and disclosure requirements. The school excluded her from the team. Her parents, John and Shannon Weber (plaintiffs), initiated this action for declaratory judgment and damages, arguing that the district's policy violates Ginelle's right to be free from unreasonable searches and seizures guaranteed by Article I, section 9, of the Oregon Constitution.

The trial court concluded that the district's policy violates Ginelle's rights under Article I, section 9, only to the extent that it required her to disclose her use of any prescription medication before having tested positive for alcohol or drug use; the court upheld the constitutionality of the policy in all other respects. The district then revised its policy, eliminating the compelled disclosure of prescription medication use. The court upheld the constitutionality of the policy as revised. It also dismissed the claim for damages. Plaintiffs appeal, arguing that the trial court erred in concluding that the requirement that student athletes submit to random urinalysis does not violate Ginelle's state constitutional rights and in dismissing their claim for damages. The district cross-appeals, arguing that the trial court erred in concluding that the portion of the policy requiring disclosure of prescription medication use is unconstitutional.

On the appeal, we conclude that plaintiffs have failed to demonstrate the unconstitutionality of the district's policy, as revised. On the cross-appeal, we conclude that the trial court was correct in holding that the required disclosure of all prescription medication use is unconstitutional. Because we conclude that the trial court did not err in upholding the constitutionality of the district's policy as

revised, we need not address plaintiffs' arguments concerning the dismissal of their claim for damages. We therefore affirm on the appeal and on the cross-appeal.

## I.  FACTUAL BACKGROUND

The relevant facts are not in dispute. In June 2000, the district's elected school board adopted a drug-testing policy for student athletes as part of the district's participation in a national program funded by the National Institutes of Health. That policy provides that, "[a]s part of the district's substance abuse prevention efforts," high school students who participate in extracurricular athletic programs are subject to random urinalysis testing to

"1.  Provide for the student athletes' health and safety by preventing the use of alcohol and drugs;

"2.  Undermine the effects of peer pressure; and

"3.  Encourage participation in treatment programs for student athletes with substance abuse problems."

The policy provides that no student who tests positive for illegal drugs will be penalized academically. It further provides that test results will not be documented in any student's school records or disclosed to criminal or juvenile authorities in the absence of an unsolicited subpoena. The policy also requires students to disclose whether they have been or are taking prescription medications and to provide verification of the prescription on request.

The policy spells out in detail the testing protocol:

"Testing will be conducted by a laboratory selected by the Oregon Health Sciences University. Chain of custody procedures, as recommended by the laboratory, will be followed.

"Samples will be collected by the OHSU representative and sent to their laboratory the same day the student is selected for testing, or if the student is absent on that day, the student will be tested on the next follow-up testing day. The selected student will be in direct contact with the collector until a specimen is produced. All students selected for testing will be given the option of using a modesty drape, however, all collections will be under direct observation of a

physician collector. A student may use their [*sic*] own physician upon student/parent request (costs to be covered by parent if personal physician is used as the collector). If a student is unable to produce a sample on the collection day, the student will be tested on the next follow-up day. The next follow-up day will not be known to the student. Students who refuse to provide a sample will be considered to have tested positive * * *.

"The testing laboratory will test for alcohol and other classes of illegal drugs. Samples will not be screened for the presence of any substance other than alcohol or the illegal drugs or masking agents.

"Samples will be split at the time of the testing. The duplicate samples will be sealed and maintained by the laboratory in the event a second test is requested.

"The testing laboratory will report results only to the superintendent or the superintendent's designee and the Oregon Health Sciences University (OHSU). The latter results to OHSU are by confidential code number, not the identifying name of the specimen provider."

The specific substances for which tests will be taken are narcotics, cocaine, phencyclidine, amphetamines and methamphetamines, alcohol, marijuana, and anabolic steroids. Common medications, such as antidepressants, Ritalin, and birth control pills, do not generate positive test results.

The testing protocol is based on the United States Olympic Committee's random drug testing program and conforms to guidelines established by the National Institute on Drug Abuse. It is extremely accurate.

Consenting student-athletes are assigned identification numbers, which are maintained in a computer data base. A research statistician then selects students for testing by means of a program that randomly generates a list of identification numbers, which are then assigned testing dates. The researcher does not have access to the names that match the identification numbers.

If the test results are positive, the student or his or her parent may request that the second sample be tested. If the second sample tests negative, the student and parent are

notified and no further action is taken. But if the second sample tests positive, then discipline may follow.

If a sample tests positive for alcohol or any of the targeted drugs, the student and parent or parents must be notified, and a meeting with the principal must occur. At the meeting, the student will be given the option of participating in drug or alcohol assistance program evaluation, further drug testing, and participation in a drug or alcohol assistance program, if recommended. The student also is subject to a two-week suspension from athletics. In the case of a second positive result, the student and the parent or parents again are notified and a second meeting is scheduled with the principal. The student will be suspended from athletics for the remainder of the season and the next season for which the student is eligible. To participate in school athletics after that requires participation in drug or alcohol assistance evaluation, further testing, and participation in a drug or alcohol assistance program.

Students who wish to participate in extracurricular athletics are required to sign a written drug testing consent form, which authorizes the district to conduct random drug testing and authorizes the release of the test results to the district, OHSU, and the parent or parents.

Ginelle, a student at Oakridge High School, wishes to participate in school athletics, specifically, the high school volleyball team. She tried out for and made the team. She declined to sign a written drug testing consent form, however. In consequence, she was declared ineligible for the team.

Plaintiffs then brought this action on Ginelle's behalf for declaratory and monetary relief, arguing that the district's policy violates Ginelle's right to be free of unreasonable government searches, as provided in Article I, section 9, of the Oregon Constitution. Plaintiffs moved for summary judgment on their claim for declaratory relief, supported by a copy of the district's policy and affidavits from Ginelle and her mother, each attesting to her good standing in school and her refusal ever to take illegal drugs. Plaintiffs' theory of the

case was straightforward: Under Article I, section 9, a warrantless search is unreasonable unless it fits within a recognized exception to the warrant requirement. Because there is no exception that applies to this case, the policy is unconstitutional.

The district opposed the motion for summary judgment.[1] It argued that (1) its policy does not require students to submit to a "search" within the meaning of Article I, section 9; and (2) if it does, any search required under the policy is an "administrative search" that, under Article I, section 9, is not subject to the warrant requirement as long as the policy was adopted by politically accountable officials, eliminates the exercise of discretion, and is reasonable in relation to its purpose.

In support of the argument that the policy entails lawful administrative searches, the district offered the affidavits of a state police officer, physicians, and educators concerning the nature of the policy, its purpose, and its scope. Among other things, the district offered evidence of the nature of the drug and alcohol problem among Oakridge High School students generally and student-athletes particularly. The district reported that, in the fall of 2000, 80 percent of student-athletes reported ever having used alcohol. More than 62 percent reported that they had engaged in drinking and driving or had been a passenger in a car with a driver who had been drinking. Twenty-one percent reported actually being drunk within the past month. Nearly 25 percent of Oakridge student-athletes had tried two to seven different drugs. Nearly 10 percent had used steroids. Overall, Oakridge High School's students had a higher use of alcohol and illicit drugs than other, similarly situated, high schools in Oregon.

The district offered evidence of the risks of harm that alcohol and illicit drug use pose to Oakridge High School students, including deleterious effects on normal mental and

---

[1] Although the district did not actually file a cross-motion for summary judgment, in its memorandum in opposition to plaintiffs' motion, the district argued that it was entitled to judgment as a matter of law. In fact, all parties and the trial court treated the matter as if submitted for disposition on stipulated facts.

physical development and the increased likelihood of developing alcohol or drug dependencies. The district also offered evidence of dangers to student-athletes, including an increased risk of injury to the students, their teammates, and their opponents, particularly in the case of contact sports. The district also offered evidence of its past attempts to prevent student alcohol and illicit drug use, including a laundry list of educational and refusal skills programs that had proven ineffective in accomplishing their purpose.

Plaintiffs contested none of that evidence. Instead, they argued that the "evidence is useless because it proves facts that are not in dispute, and not relevant anyway." According to plaintiffs, because "there is no authority * * * for an administrative search exception to the warrant and suspicion requirements of Article I, section 9," evidence of the reasonableness of the district's policy is immaterial. According to plaintiffs, the only relevant consideration is that the policy requires students to submit to a warrantless search that is not subject to a recognized exception to the warrant requirement.

At oral argument on the motion for summary judgment, the trial court expressed concern that the policy's requirement that randomly selected students disclose all prescription drug use might be unconstitutional. In response to that concern, the district submitted a proposed revision to the policy, which eliminated that component and substituted a provision that merely *permits* a student who has tested positive for alcohol or illicit drug use to submit evidence that lawfully prescribed medications account for the test results.

The trial court ultimately concluded that the district's policy does entail "searches" within the meaning of Article I, section 9, but that the type of searches involved does not require a warrant. According to the trial court, the searches involved in the district's policy are "part of a regulatory scheme rather than a criminal investigation" and therefore do not require a warrant as long as they are reasonably necessary to accomplish the purposes of the policy. The court concluded that the random urinalysis required by the district's policy is reasonably necessary. The court reached a different conclusion with respect to the original requirement

that students selected for the urinalysis also disclose any prescription medication use. According to the trial court, that disclosure requirement is not sufficiently limited to the purposes of the policy to satisfy the reasonableness test. The court went on to say, however, that the proposed revision to the policy—which eliminates the requirement of disclosure and now merely permits a student to demonstrate that a positive test was a result of prescription medications—is constitutional.

Following the trial court's ruling on the summary judgment motion, the district adopted the proposed revision concerning the voluntary disclosure of prescription medications. Meanwhile, the district moved to dismiss plaintiffs' claim for damages. The trial court granted the motion and then entered judgment accordingly.

On appeal, plaintiffs argue that the trial court erred in concluding that the district's policy is constitutional at all. Specifically, they argue that the trial court erred in concluding that so-called "administrative searches" do not require the issuance of a warrant or compliance with a recognized exception to the warrant requirement. The reasonableness of the policy, they argue, is irrelevant. All that matters is that the policy requires students to consent to warrantless searches. According to plaintiffs, both the random urinalysis and the now-voluntary disclosure of prescription drug use components of the policy amount to unlawful searches.

In response, the district first argues that it is not necessary to address the merits of plaintiffs' arguments because their claims are nonjusticiable. According to the district, because Ginelle actually never has been selected to participate in the urinalysis or disclosure process, her claim is not yet ripe. Assuming that the claim is justiciable, the district then argues that the trial court correctly concluded that the policy involved an administrative search that is reasonable in relation to its purpose. In the alternative, it argues— as it did to the trial court—that the policy does not even involve a "search" within the meaning of Article I, section 9, and that, even if it does, in accordance with various federal cases decided on similar facts, on balance the search is reasonable. The district also cross-appeals, challenging the

trial court's conclusion that the compelled disclosure of pre-scription drug use, which was a component of the original policy, is unconstitutional.

## II. JUSTICIABILITY OF PLAINTIFFS' CLAIMS

Before addressing the parties' arguments on the merits, we must first address the district's contention that plaintiffs' claims are nonjusticiable. Justiciability must be established before this court may address the merits of an appeal. *Barcik v. Kubiaczyk*, 321 Or 174, 187, 895 P2d 765 (1995). Moreover, it is a matter that may be raised for the first time on appeal. *US West Communications v. City of Eugene*, 177 Or App 424, 428, 37 P3d 1001 (2001), *rev allowed*, 334 Or 693 (2002).

The district's justiciability argument need not long divert us from the merits. ORS 28.010 authorizes courts to declare the rights, status, and legal relations of parties to a justiciable controversy. A controversy is "justiciable" if it involves "an actual and substantial controversy between parties having adverse legal interests." *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982). Such a controversy "must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue." *Id.*

4. In this case, there is nothing abstract or hypothetical about plaintiffs' claims. Although the question whether Ginelle ever will be tested may be a matter of hypothecation, the requirement that she consent to such testing is not. It is that requirement that forms the basis of plaintiffs' claims. Their daughter tried out for and made the school volleyball team but was excluded from participating because she and her parents declined to consent to the district's drug-testing policy. The lawfulness of the policy in requiring her to choose between submitting to the terms of the drug-testing policy and forgoing participation in school athletics involves an actual and substantial controversy based on present and concrete facts. Plaintiffs' claims are justiciable.

## III. ANALYSIS OF CLAIMS ON THE MERITS

A few additional preliminaries are necessary to frame properly the disposition of the parties' arguments. First, because the facts are undisputed, we examine the trial court's decision with respect to the constitutionality of the

district's policy to determine whether the district is entitled to judgment as a matter of law. *Lane Transit District v. Lane County*, 327 Or 161, 167, 957 P2d 1217 (1998). Second, because this is a civil declaratory judgment action, plaintiffs have the burden of demonstrating the unconstitutionality of the policy. Directly on point in that regard is *Smith v. Washington County*, 180 Or App 505, 43 P3d 1171, *rev den*, 334 Or 491 (2002). In that case, the plaintiffs brought a civil declaratory judgment action challenging the constitutionality of a courthouse security policy. We held that, "because this is a civil declaratory judgment action, 'plaintiff[s have] the burden of demonstrating claimed illegalities.' " *Id.* at 517 (quoting *Nelson v. Lane County*, 304 Or 97, 101, 743 P2d 692 (1987) (plurality)) (brackets in *Smith*). That merits some emphasis, because it is different from the assignment of burdens in a criminal case. *See, e.g., State v. Barnes*, 172 Or App 408, 412, 18 P3d 1108 (2001) (in a criminal case, the burden is on the state to establish the lawfulness of a warrantless search or seizure). In order to prevail in this case, plaintiffs must affirmatively establish the unlawfulness of the policy; it is not sufficient for plaintiffs to assert that the district has failed to demonstrate its lawfulness.

A. *Does the district's policy entail a search or a seizure?*

Article I, section 9, of the Oregon Constitution provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The provision imposes a requirement of reasonableness only if there is, in fact, a search or seizure. Thus, our first inquiry is whether the district's policy requires students to submit to a "search" or "seizure." *See, e.g., State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990) ("the threshold question in any Article I, section 9, search analysis is whether the police conduct at issue is sufficiently intrusive to be classified as a search").

The district argues that, at least in this context, the urinalysis that the policy requires is not a search or seizure

within the meaning of Article I, section 9. The district concedes that urination "usually is a highly private activity." It nevertheless insists that, in the context of school sports, it is not. That is so, the district argues, because "[s]tudents who wish to play school sponsored sports do not have an interest in freedom from close scrutiny of their fitness to play safely." In other words, the district argues that, because of the nature of school sports, students cannot reasonably expect privacy in the act of urination. The district does not contend that the disclosure of information concerning prescription drug use is not a search.

■     Under Article I, section 9, a search is "an intrusion by a governmental officer, agent, or employee into the protected privacy interest of an individual." *State v. Rhodes*, 315 Or 191, 196, 843 P2d 927 (1992). An individual either has a protected privacy interest or does not; the existence of such an interest does not depend on the reasonableness of the individual's subjective expectations in various circumstances. *State v. Wacker*, 317 Or 419, 425 n 11, 856 P2d 1029 (1993); *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988).

We begin with the random urinalysis component of the policy. The extraction of human bodily fluids generally is a search of the person and a seizure of the fluid itself. In *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988), for example, the Supreme Court held that the police could not draw a person's blood without satisfying the requirements of Article I, section 9, and the Fourth and Fourteenth Amendments to the United States Constitution. Indeed, we have held that the testing of the contents of human blood implicates a privacy interest protected by Article I, section 9, even when the blood otherwise was obtained lawfully. In *State v. Binner*, 131 Or App 677, 683, 886 P2d 1056 (1994), the defendant consented to a blood draw for the purposes of testing blood alcohol content. Without informing the defendant, the state also tested the blood for the presence of illicit drugs. We held that the state could not do so without a warrant or satisfaction of an exception to the warrant requirement of Article I, section 9, in criminal cases. Even when the blood otherwise was permissibly drawn, we held, "[s]uch testing could reveal the most personal of the medical details of our private lives that would not be known to the public in general." *Id.* at 682.

■ We can divine no basis on which to distinguish the collection of blood from an individual's body and the collection of urine. Both are bodily fluids that are not ordinarily available for public inspection except by intrusive means. To be sure, blood is drawn by means of a surgical intrusion. But obtaining urine is no less intrusive to an individual's privacy. As Judge (now Justice) Gillette remarked, albeit in a slightly different context,

> "the final bastion of privacy is to be found in the area of human procreation and excretion and the nudity which may accompany them. If a person is entitled to any shred of privacy, then it is to privacy as to these matters."

*Sterling v. Cupp*, 44 Or App 755, 761, 607 P2d 206 (1980), *aff'd as modified*, 290 Or 611, 625 P2d 123 (1981); *see also Skinner v. Railway Labor Executives' Assn.*, 489 US 602, 617, 109 S Ct 1402, 103 L Ed 2d 639 (1989) (quoting *National Treasury Employees Union v. Von Raab*, 816 F2d 170, 175 (5th Cir 1987)) (" 'There are few activities in our society more personal or private than the passing of urine.' ").

We similarly can articulate no basis on which to distinguish the examination of urine from the examination of blood, even if otherwise validly obtained. Both fluids contain information that is of a most personal and private nature and that is otherwise not available to public inspection without consent. Examination of urine may reveal a host of medical facts, including whether an individual is diabetic, epileptic, or—in the case of a woman—pregnant. None of that information, to put it plainly, is the public's business if the individual does not want it to be.

The district's arguments to the contrary are not persuasive. To begin with, the argument that student athletes cannot reasonably expect to be free from scrutiny in the act of urination reflects a reliance on an expectation of privacy analysis that simply is not appropriate under Article I, section 9. As the Supreme Court explained in *Campbell*, under Article I, section 9, searches and seizures are not defined in terms of reasonable expectations of privacy. Under the Oregon Constitution, the court stated, "the privacy protected by Article I, section 9, is not the privacy that one reasonably

*expects* but the privacy to which one has a *right.*" 306 Or at 164 (emphasis in original).

Aside from that, even if the district were correct that the act of obtaining a urine sample does not implicate Article I, section 9, the fact remains that *examining* the contents of the urine plainly, and independently, does. We therefore conclude that the random urinalysis component of the district's policy amounts to a search or seizure within the meaning of Article I, section 9, of the Oregon Constitution.

That leaves the prescription drug use disclosure component of the policy. The original policy compelled advance disclosure of a student's use of any prescription medications. As we have noted, the district does not contend that that compelled disclosure of prescriptions is not a search within the meaning of Article I, section 9. We therefore assume, for the purposes of this opinion, that such compelled disclosure amounts to a search.

As for the disclosure provision of the revised policy, there appears to be no disclosure requirement at all. The revised policy *permits* a student who already has tested positive to offer an explanation of that test result by disclosing his or her use of a lawful prescription medication that could have produced that result. But it does not, by its terms, *require* the student to do that. Plaintiffs point out, however, that, in the event of a positive test result, the student is effectively forced to disclose his or her prescription medication use to avoid the consequences that the policy prescribes. The district does not contest that point. We need not resolve that debate. As we explain below, even if the revised policy entails a "search" within the meaning of Article I, section 9, plaintiffs have failed to establish that it does so unlawfully.

B. *Is any search or seizure required by the policy "unreasonable"?*

Article I, section 9, provides that no "law" may violate the right to be secure against "unreasonable search, or seizure." The Supreme Court has construed that to mean that "[a]ny intrusion of state power upon a constitutionally

protected interest, be it for civil or criminal investigative purposes, must comply with constitutional standards." *State v. Bridewell*, 306 Or 231, 239, 759 P2d 1054 (1988).

The parties in this case debate the precise nature of those constitutional standards. Plaintiffs argue that, in all cases, the constitution requires either a warrant or satisfaction of a recognized exception to the warrant requirement. The district argues that, while that standard may apply to criminal cases, a different standard applies when a search is conducted for noncriminal, "administrative" purposes. According to the district, an administrative search is "reasonable" within the meaning of Article I, section 9, if conducted pursuant to a policy adopted by a politically accountable body and if reasonable in relation to its purpose. Plaintiffs insist that there is no such administrative search "exception" to the warrant requirement of Article I, section 9. Plaintiffs contend that neither the case law nor the historical evidence of the framers' intentions supports the notion that warrantless administrative searches are constitutionally permissible.

■　　At the outset, a few words about interpretive method. The Supreme Court has stated that the proper object of constitutional interpretation—at least where provisions of the original constitution are concerned—is " 'to ascertain and give effect to the intent of the framers [of the provision at issue] and of the people who adopted it.' " *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000) (quoting *Jones v. Hoss*, 132 Or 175, 178, 285 P 205 (1930)) (brackets in *Stranahan*). To ascertain that intent, the court requires examination of a constitutional provision at three "levels": (1) its specific wording; (2) the case law surrounding it; and (3) the historical circumstances that led to its adoption. *See generally Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (describing three-level method of analysis).

The Supreme Court has not applied that interpretive method to all provisions of the original constitution, however. *See, e.g., State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993) (applying different method of analysis to Article I, section 16); *State v. Robertson*, 293 Or 402, 411-12, 649 P2d 569 (1982) (applying different

interpretive analysis to Article I, section 8). More importantly for our purposes, so far as we can tell, the court has not applied that interpretive method to Article I, section 9. In addition, although both plaintiffs and the district advance arguments supposedly based on their understandings of the framers' intentions, neither offers anything significant in the way of historical evidence in support of those understandings.[2] Particularly in light of the fact that a more historically oriented interpretive approach has at least the potential to lead to conflicts with well-established rules of law, we are not inclined to attempt to undertake on our own an effort to determine the framers' intentions with respect to the issues in this case. *See, e.g., Stranahan*, 331 Or at 66 n 19 (declining to address question of framers' original intent because parties failed to brief it adequately).[3] Accordingly, in addressing

---

[2] Plaintiffs, for example, argue that the historical evidence provides no basis for any exception to the warrant requirement of Article I, section 9. Because there was no such exception in 1857, they argue, "there cannot be one now."

The district argues that the framers would have understood that any warrant requirement did not apply to searches of children in school. According to the district, at common law, the rights of children were "especially limited in the school context," as evidenced by, among other things, school teachers' immunity from tort liability for administering corporal punishment.

[3] It is, for example, at least debatable whether the framers would have regarded all warrantless searches to be presumptively unreasonable, even in criminal cases. Historians and legal scholars of the Fourth Amendment—after which Article I, section 9, was patterned—debate whether the meaning of the first clause, which requires that searches and seizures be reasonable, is dependent upon the second clause, which requires that warrants be issued only upon probable cause.

Some suggest that the two clauses were originally understood to apply independently, so that the requirement that searches be reasonable does not necessarily require a warrant. *See, e.g.,* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv L Rev 757, 759 (1994) ("We need to read the [Fourth] Amendment's words and take them seriously: they do not require warrants, probable cause, or exclusion of evidence, but they do require that all searches and seizures be reasonable."). Such a view occasionally has been met with favor by the United States Supreme Court. *See, e.g., United States v. Rabinowitz*, 339 US 56, 63, 66, 70 S Ct 430, 94 L Ed 653 (1950) ("The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case * * *. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.") (citation omitted), *overruled by Chimel v. California*, 395 US 752, 765-68, 89 S Ct 2034, 23 L Ed 2d 685 (1969).

Others maintain that the conjunctive "and" that connects the two clauses would have been understood by the framers to mean "therefore." Thus, a warrantless search would be presumptively unreasonable. Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 43 (1966) ("The second clause * * * defines and interprets the first, telling us the kind of search that is *not* 'unreasonable[.]' ") (emphasis in original); Bradford P. Wilson,

the arguments of the parties, we are guided by existing case law construing and applying Article I, section 9.

## 1. What is "unreasonable"?

As we have noted, Article I, section 9, requires that searches and seizures not be "unreasonable." What is reasonable or unreasonable is not something capable of precise advance determination. Consistently with that reality, the case law construing Article I, section 9, provides that the nature of the constitutional standard will depend on the purpose of the search in each case. Thus, in criminal cases, the courts routinely state that warrantless searches are *per se* unreasonable unless they fall within a well-established exception to the warrant requirement. *See, e.g., State v. Brown*, 301 Or 268, 273, 721 P2d 1357 (1986) ("The warrant requirement * * * may be dispensed with in only a few specifically established and well-delineated circumstances."); *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) ("warrantless entries and searches of premises are *per se* unreasonable").

That rule does not apply to noncriminal "administrative searches," however. In *State v. Atkinson*, 298 Or 1, 688 P2d 832 (1984), the Supreme Court held that the ordinary warrant requirement that applies in criminal cases does not apply to a police inventory of the contents of an impounded vehicle pursuant to a lawful inventory policy. The court reasoned that, if "politically accountable officials" decide that protective reasons for conducting an inventory justify the particular procedures that the policy describes, the policy is not "unreasonable" within the meaning of Article I, section 9,

---

*Enforcing the Fourth Amendment: A Jurisprudential History* 12 (1986) ("Although it is not obvious from the language alone, the antecedent history of the amendment makes clear that the second clause was intended by the framers to provide a standard, though not necessarily an exhaustive one, of what constitutes a reasonable or an unreasonable search or seizure."). It is a position that was famously advanced by Justice Frankfurter in *Harris v. United States*, 331 US 145, 161-62, 67 S Ct 1098, 91 L Ed 1399 (1947) (Frankfurter, J., dissenting) ("The plain import of [the Fourth Amendment] is that searches are 'unreasonable' unless authorized by a warrant, and a warrant hedged about by adequate safeguards. 'Unreasonable' is not to be determined with reference to a particular search and seizure considered in isolation."), *overruled by Chimel*, 395 US 752, 765-68.

There is also a contingent in the scholarly community that questions whether the intentions of the framers with respect to the Fourth Amendment can be known with any confidence. *See, e.g.*, Carol S. Steiker, *Second Thoughts about First Principles*, 107 Harv L Rev 820, 823 (1994).

provided certain conditions are satisfied. *Id.* at 6-11. In particular, the court emphasized that, if the vehicle is in lawful custody, any inventory of its contents

> "must be conducted pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion by the law enforcement person directing or taking the inventory."

298 Or at 10. In addition, the scope of the inventory "must be limited to that—an inventory." *Id.* In other words, actions taken pursuant to the inventory must be reasonably related to its purpose.

In *Nelson v. Lane County*, 304 Or 97, 743 P2d 692 (1987), a plurality of the Supreme Court explained that *Atkinson* had established a different standard for administrative searches. At issue in *Nelson* was the constitutionality of police sobriety checkpoints. This court had concluded that the checkpoints were unconstitutional because they permitted police officers to stop drivers without "individualized probable cause." *Nelson v. Lane County*, 79 Or App 753, 760, 720 P2d 1291 (1986). The Supreme Court affirmed, but on different grounds. Writing for the plurality, Justice Carson explained that, "in the realm of criminal law enforcement," the familiar warrant requirement—or a recognized exception to the warrant requirement—applies. *Nelson*, 304 Or at 104. Having said, that, however, he explained further:

> "In *Atkinson*, we suggested that another method existed for administrative searches. We held that an administrative search conducted without individualized suspicion of wrongdoing could be valid if it were permitted by a 'source of the authority,' that is, a law or ordinance providing sufficient indications of the purposes and limits of executive authority, and if it were carried out pursuant to 'a properly authorized administrative program, designed and systematically administered' to control the discretion of non-supervisory officers. [*Atkinson*,] 298 Or at 9, 10.

> "The purpose of the search and the consequences that flow from it are significant. In *Atkinson*, the purpose of the inventory was to protect impounded property and not for

'enforcement purpose[s].' 298 Or at 8. Preventing prospective or ongoing violations is an administrative purpose as well, so long as the intended consequences of noncompliance with whatever standards the inspection is meant to uphold are noncriminal. If offenders face criminal sanctions, the inspection implicates criminal law enforcement purposes and is not 'administrative' in nature."

*Id.* at 104-05 (footnotes omitted; brackets in original). The plurality then concluded that, because the checkpoints at issue in that case were not being conducted pursuant to any recognized source of authority, they were not lawful administrative searches. *Id.* at 106.

Relying on both *Atkinson* and *Nelson*, we recently held that certain security procedures implemented as a condition of entry into a county courthouse constituted a valid "administrative search" that did not offend Article I, section 9. *Smith*, 180 Or at 523. We began by noting that the constitution requires that searches and seizures be reasonable. *Id.* at 516. We then explained that what is "reasonable" depends on the purpose of the search. *Id.* Administrative searches— those conducted for a purpose other than enforcement of the law by criminal sanctions—are lawful if, among other things, they are

"properly authorized, which means that politically accountable officials, through laws, ordinances, or delegations of rulemaking authority, have engaged in the predicate policy-making choice to take such action."

*Id.*

From the foregoing cases, it is clear that plaintiffs' position—that administrative searches are treated no differently from any other search—is untenable. The warrant requirement does not apply categorically to all searches and seizures. To the contrary, "administrative searches or seizures" may be reasonable without a warrant, provided certain conditions are met. The proper disposition of this case therefore turns on whether the searches or seizures involved in the district's drug testing policy properly may be classified

as "administrative" and, if so, whether the searches performed pursuant to that policy meet all of the conditions of reasonableness that the case law requires with respect to that category of searches.

   2.   *Are the searches or seizures in the district's policy "administrative"?*

■     We begin with the question whether the searches or seizures at issue are "administrative" in nature. An "administrative" search is one conducted "for a purpose other than the enforcement of laws by means of criminal sanctions." *State v. Anderson*, 304 Or 139, 141, 743 P2d 715 (1987). That does not mean that the search may not be conducted for purposes of investigation. *Nelson*, 304 Or at 104 n 4. What is important are the "intended consequences" of the investigation. *Id.* at 104. If those intended consequences are criminal prosecution, then the search is not administrative in nature. *Id.* at 104-05.

■     In this case, the primary purposes of the district's drug-testing policy are noncriminal. They are to deter student use of alcohol and illicit drugs, to encourage participation in treatment programs, and to avoid injuries to student-athletes. Students who test positive for alcohol or illicit drug use are not penalized academically, much less criminally. The test results are not documented in any student's school records, nor are they intended to be disclosed to criminal or juvenile authorities. The policy expressly states that school authorities will not initiate contact with law enforcement authorities concerning the results of drug tests.

Plaintiffs insist that the policy may not fairly be characterized as "administrative" because the district "cannot guarantee that evidence obtained through its drug-testing program will not be subpoenaed by prosecutors for the purpose of laying criminal charges against a student." That there is some *possibility* that evidence obtained by means of a search *might* be used later as the basis for a criminal prosecution is not the test, however. As we have stated, the determinant is the "intended consequence[ ]" of the policy, and, in this case, on that point, there is no dispute. *Nelson*, 304 Or at 104.

3. *Do the searches satisfy the conditions of reasonableness that apply to administrative searches?*

Having determined that, as a matter of law, the district's policy calls for administrative searches, the next question is whether searches conducted under that policy satisfy all the conditions of reasonableness that Article I, section 9, requires. In this case, the parties debate the lawfulness of the urinalysis and the disclosure of prescription drug use. We therefore consider the lawfulness of each in turn.

a. Random urinalysis

█ █ We begin with the random urinalysis, consent to which the policy requires. The first condition of reasonableness is that an administrative search be "properly authorized" by a "politically accountable lawmaking body." The Supreme Court has explained that "proper authorization" may derive from a number of different sources:

> "Potential sources of proper authorization by politically accountable lawmakers would include, for example, a statute enacted by the Oregon Legislature or by the electorate through the initiative or referendum process, a regulation based on a statute, a city or county charter provision, a city or county ordinance, or a policy or procedure promulgated pursuant to authority."

*State v. Holmes*, 311 Or 400, 404 n 4, 813 P2d 28 (1991). The district's drug policy qualifies, therefore, as long as it was "promulgated pursuant to authority."

In *Smith*, we summarized the principles relevant to determining whether a policy was adopted pursuant to authority in the following terms:

> "Such authorization need not be explicit but can be implied. *See State v. Boone*, 327 Or 307, 314, 959 P2d 76 (1998) (authority to conduct inventory of a car was implied from explicit authorization to impound granted by city ordinance); *State v. Ketelson*, 163 Or App 70, 986 P2d 1202 (1999) (the authority to conduct inventory at a detoxification center can be implied from the decision by a politically accountable body to establish the center). Nor must the politically accountable body itself conceive of, design, and authorize every aspect of the search procedures. Rather,

that body's role can be limited to one of authorizing the policy to search, while leaving the details of implementation to the agency or entity charged with executing the searches. *See Boone*, 327 Or at 314 (reasoning that the politically accountable body need not adopt the implementation procedures)."

180 Or App at 516-17.

In this case, the challenged drug policy was adopted by the Oakridge School Board. School boards are authorized by state statute. *See generally* ORS 332.002 - 332.138. Members of school boards are elected by the voters in specified districts. ORS 332.122. They may be elected at large in the district or from zones within the district, if the board so provides. ORS 332.124. In either event, they are directly accountable to the electorate every four years. ORS 332.138. Among other things, state statutes expressly require each district school board to "adopt a comprehensive alcohol and drug abuse policy and implementation plan." ORS 336.222. That policy is required to include, but is not limited to, alcohol and drug abuse prevention curricula, information programs, intervention programs, and strategies to obtain federal funds for drug abuse prevention programs. *Id.*

We conclude that the district's policy was "promulgated pursuant to authority" by a "politically accountable body." It was adopted by a publicly elected board pursuant to express statutory authority. The law requires no more than that. In arriving at that conclusion, we note that plaintiffs advance no argument to the contrary.

A second condition of reasonableness of an administrative search is that it be "designed and systematically administered so that [it] involves no exercise of discretion by the law enforcement person directing [the search]." *Atkinson*, 298 Or at 10. The purpose of that requirement is to protect against arbitrariness and to ensure that individuals or particular items of property are not improperly singled out for special attention. *State v. Bean*, 150 Or App 223, 228-29, 946 P2d 292 (1997), *rev den*, 327 Or 448 (1998).

In this case, no one suggests that the district's drug testing policy does not eliminate the discretion of those who implement it. Students are selected randomly; the school has

no discretion in selecting the particular students who will be required to submit samples for analysis. The policy also details the collection and testing protocol in a way that leaves no discretion at all. The student either tests positive for one or more of the targeted substances or does not. If a test produces a positive result, the policy spells out nondiscretionary follow-up procedures. In short, the urinalysis protocol leaves no room for arbitrariness, no room for focusing special attention on any particular student.

A third condition of reasonableness is that the scope of the search be "reasonable in relation to its purpose." *State v. Rounds*, 73 Or App 148, 153, 698 P2d 71, *rev den*, 299 Or 663 (1985).[4] The nature of this particular reasonableness inquiry warrants careful attention. It is not the reasonableness of the policy itself, rather, it is the reasonableness of any *search* that the policy requires *in relation to its purpose. Id.* Thus, for example, opening certain closed containers found during the course of an inventory may not be reasonable in relation to the purpose of protecting the owner's property. *Compare Bean*, 150 Or App at 229 (opening wallet, fanny pack, or purse is reasonable in relation to the purpose of an automobile inventory policy), *with State v. Mundt/Fincher*, 98 Or App 407, 415, 780 P2d 234, *rev den*, 308 Or 660 (1989) (opening Tylenol bottle or cigarette box is not reasonable in relation to the purpose of a booking inventory policy). The proper analysis involves first identifying the purpose or purposes of the policy and then determining whether the search is reasonable in relation to that purpose or purposes.

---

[4] In some cases, additional considerations may be relevant. For example, when there is a challenge to the seizure of evidence obtained pursuant to an administrative policy, it must be established that there was no deviation from the procedures prescribed in the policy. *See, e.g., State v. Kendall*, 173 Or App 487, 494, 24 P3d 914 (2001).

The concurrence contends that an additional "overall reasonableness test" is "implicit" in the case law, 184 Or App at 444 (Schuman, J., concurring), and that, if such an overall reasonableness test were to apply in this case, the school district's policy might fail. 184 Or App at 446-47 (Schuman, J., concurring).

We need not decide the matter in this case. As Judge Schuman notes, plaintiffs—who bear the burden of proof—have not advanced the contention that such a test is required, much less that the policy in this case does not satisfy such an overall reasonableness inquiry. We also wish to make it clear that we express no opinion as to whether the school district's policy would pass muster if such an overall reasonableness test did apply.

Concerning the purposes of its drug testing policy, the district offered evidence that they include deterring students from using alcohol and drugs, encouraging student participation in treatment programs, and minimizing the possibility of injury to student athletes. Plaintiffs do not dispute that those are the purposes of the district's policy. Nor do they dispute that those purposes are entirely legitimate.

We turn then to the reasonableness of the urinalysis itself—that is, the actual search—in relation to those purposes. Plaintiffs argue that, to survive constitutional challenge, the district must demonstrate that urinalysis is the "least restrictive means" available to accomplish a "compelling government interest." Plaintiffs concede that "[t]here is, of course, a heightened risk of injury to the student [who uses alcohol or drugs] or his [or her] opponent, especially in contact sports." In plaintiffs' view, however, such dangers exist in many aspects of life generally, and so targeting student alcohol and drug use to prevent injuries in high school sports, while perhaps a legitimate interest, simply does not rise to the level of a compelling one. Moreover, plaintiffs argue, any risk of actual injury must be slim, in light of the fact that the district failed to prove any actual incident in which alcohol or drug use was related to an athletic accident. What is more, plaintiffs note, the test itself is of limited utility, given that it demonstrates only whether a student has taken one or more of the targeted drugs without specifying precisely how much or when. Thus, plaintiffs conclude:

> "This combination of slight risk and minor harm produces a less-than-compelling argument for [the district's] drug-testing program, which is weakened further by the limitations of the test and the availability of less intrusive alternatives to the same goal."

The district argues that it is plaintiffs' burden to prove that the urinalysis is unreasonable and that plaintiffs have failed even to undertake the task. In any event, the district contends, the testing that its policy requires is reasonable in light of the seriousness of the problem, particularly in light of the documented extent of student drug use at Oakridge High School and the dangers that such drug use

pose to those students. The district points out that such testing serves to identify students who recently have used alcohol or illicit drugs, thus permitting the school to prevent injury and to initiate participation in appropriate alcohol or drug assistance programs. The district argues that other programs simply have not worked. The district relies on evidence that education-oriented efforts to deter alcohol and drug use have proven ineffective, while preliminary national results show dramatic declines in alcohol and drug use in schools that require random testing.

We agree with the district that plaintiffs misunderstand the nature of the inquiry. To begin with, plaintiffs' insistence that the district has failed to demonstrate the constitutionality of its policy belies a misapprehension of the burden of proof that applies to this case. As we have noted, this is a civil declaratory judgment action, in which it is *plaintiffs*—not the district—who bear the burden of demonstrating that the district's policy is unconstitutional. *Smith*, 180 Or App at 517.

In addition, plaintiffs' suggestion that the district is required to demonstrate that urinalysis is the "least restrictive means" to accomplish a "compelling government interest" reflects a confusion of state and federal constitutional jurisprudence. That standard certainly has been applied by the federal courts in cases involving the federal constitution, in particular the Fourteenth Amendment. *See, e.g., Bernal v. Fainter*, 467 US 216, 227, 104 S Ct 2312, 81 L Ed 2d 175 (1984) ("To satisfy strict scrutiny, the State must show that [the challenged law] furthers a compelling state interest by the least restrictive means practically available."). But it has no bearing on the evaluation of the district's policy under Article I, section 9. Under the Oregon Constitution, the determinative question is whether any search required by an administrative policy is reasonable in relation to its purpose. To be reasonable, the search need not be the least restrictive means to accomplish an end. *See, e.g., Clackamas Town Center Assoc. v. Wolf*, 105 Or App 593, 597-98, 806 P2d 146 (1991), *aff'd in part and rev'd in part on other grounds*, 315 Or 557, 849 P2d 477 (1993) (restrictions may be "reasonable" even if not the "least restrictive means" of accomplishing a purpose).

Thus, plaintiffs' argument that the district has failed to establish that the risk of injury to student-athletes is sufficiently serious to qualify as "compelling" is beside the point. Plaintiffs concede that there is a heightened risk of injury when student-athletes use alcohol or illicit drugs. The relevant question therefore is whether the urinalysis that the district's policy requires is reasonable in relation to the purpose of avoiding that risk, whether or not that purpose is "compelling." Plaintiffs do not address that question.

Similarly, plaintiffs' complaint that the district failed to quantify the actual risk of injury is, again, beside the point. Plaintiffs concede that there is such a risk. If they believe that it is too small to be legally cognizable, it is for them to establish the fact. Otherwise, the pertinent question is whether any search required by the policy is reasonable in relation to the purpose of avoiding that risk.

The closest plaintiffs come to addressing the proper inquiry is in arguing that the urinalysis that the district's policy requires has limited utility because it "does not cure drug use, nor does it prevent athletes from competing while on drugs." But, even there, their argument fails. Merely because a means selected to accomplish an end is underinclusive or less than perfect does not mean that it is unreasonable. *Cf. Adams v. PERB*, 180 Or App 59, 71, 42 P3d 911 (2002) (underinclusive statute that is "reasonably related" to a lawful purpose does not violate Article I, section 20); *Crocker and Crocker*, 157 Or App 651, 662, 971 P2d 469 (1998), *aff'd*, 332 Or 42, 22 P3d 759 (2001) (legislative classification that is less than perfect still may be reasonable). Moreover, the purpose against which the reasonableness of the district's policy is evaluated is not to cure drug use or absolutely prevent any athlete from competing while on drugs. It is, among other things, to provide a deterrent to alcohol and illicit drug use. Even plaintiffs concede that the random urinalysis that the policy requires has some deterrent effect.

In short, plaintiffs do not argue—much less establish—that the random urinalysis that the district's policy requires is unreasonable in relation to its purposes. Instead, they devote their energies to attacking a straw man, namely,

the district's failure to comply with a burden of proof and a legal standard that do not apply to this case.

Because the urinalysis component of the district's policy was authorized by a politically accountable body, involves no discretion by the person or persons directing it, and has not been shown to be unreasonable in relation to the purposes of the policy, we conclude that the trial court did not err in holding that it does not offend Article I, section 9, of the Oregon Constitution.

b.    Disclosure of prescription drug use

We turn to the question whether the prescription drug use disclosure component of the district's policy likewise satisfies the relevant conditions of reasonableness that apply to administrative searches. The trial court ruled on the constitutionality of that component in each of two different forms: first, the mandatory disclosure of prescription medication use before testing positive, which the trial court held unconstitutional; and second, the voluntary disclosure of such medication use to explain a positive test result after the fact, which the court held constitutional. The former is the subject of the district's cross-appeal, while the latter is the subject of plaintiffs' appeal.

We begin with the policy in its original form, involving the mandatory disclosure before testing.[5] Citing the United States Supreme Court's decision in *Vernonia School Dist. 47J v. Acton*, 515 US 646, 115 S Ct 2386, 132 L Ed 2d 564 (1995), the district contends that the disclosure requirement is reasonable because it does not require much in the way of information that students are not already required to

---

[5] It is at least arguable that the constitutionality of the policy in its original form is a moot question, given that it no longer exists. The voluntary cessation of an action or policy challenged in a declaratory judgment proceeding, however, does not necessarily moot the action. In *Tanner v. OHSU*, 157 Or App 502, 971 P2d 435 (1998), for example, the plaintiffs challenged the constitutionality of the employer's benefits policy, which denied health benefits to the unmarried domestic partners of employees. During the course of the litigation, the employer amended its policy to grant those health benefits, although it continued to maintain that it had the authority to deny them. We held that the amendment of the benefits policy did not moot the action. *Id.* at 510. Likewise, in this case, the district amended its policy while continuing to assert the constitutionality of the original policy. The constitutionality of the original policy thus presents a live controversy.

provide and because the information would remain confidential. Plaintiffs complain that the district improperly invokes federal case law construing the federal constitution and fails to account for the fact that much of the information that is requested will have nothing to do with the use of illicit substances or with proper administration of the testing for targeted drugs.

Interestingly, with respect to this issue, it is the district that fails to advance the proper legal analysis. As we have noted, the district has conceded that the portion of the district's policy that compelled disclosure of prescription medication use amounted to an administrative search. The reasonableness of that search turns on whether it was properly authorized by a politically accountable body, designed to eliminate discretion by those implementing it, and reasonable in relation to the policy's purposes. There is no debate that the requirement was properly authorized and that it entails no discretion; the only debate is whether it is reasonable in relation to the policy's purposes.

As noted, the purposes of the policy include deterring alcohol and illicit drug use and avoiding injury to student-athletes by means of accurate identification of student-athletes who are using alcohol or illicit drugs. To accomplish that purpose, the policy prescribes procedures to ensure that identification of alcohol and illicit drug use in fact is accurate, that is, to ensure that a student-athlete does not falsely test positive when subjected to the urinalysis. Ostensibly, the prescription medication requirement is intended to identify any lawful medications that can affect the urinalysis test results for alcohol and other targeted substances. That said, we do not understand—and the district does not explain—why it is reasonably necessary for students to disclose their use of *every* prescription medication, whether or not it would affect the outcome of the testing for alcohol and illicit drug use. Indeed, the district itself emphasizes that any number of prescription medications—such as antidepressants, Ritalin, and birth control pills—would not affect test results. If that is so, then we are at a loss to understand why requiring students to disclose their lawful use of those substances advances any purpose of the district's drug testing policy. We therefore conclude that the trial court correctly held that the

portion of the policy requiring advance disclosure of all prescription drug use violates Article I, section 9, of the Oregon Constitution.

■ There remains the issue of the constitutionality of the policy in its current form. As we noted above, there is some question whether the revised policy entails a "search" within the meaning of Article I, section 9, in providing only that the student *may* offer evidence of his or her prescription drug use to explain a positive test result. But, for the purposes of our analysis in this case, we assume that the policy does implicate an administrative "search."

Once again, there is no argument that the current version of the policy was not properly adopted by a politically accountable body or that it fails to eliminate the exercise of discretion by those implementing it. The only question is whether any disclosure involved is reasonable in relation to the purposes of the policy. The district argues that the revised policy actually requires nothing in the way of disclosures from student-athletes. It merely provides that, once a student tests positive for alcohol or illicit drug use, the student has the opportunity to disclose any prescription drug use that might serve to explain the test results. Thus, the district argues, the limited and voluntary disclosure is directly related to ensuring the accuracy of the urinalysis results. Plaintiffs offer no explanation as to why the district is not correct. They simply argue that the policy is not really "voluntary," because the positive test results will stand if the student does not disclose his or her prescription drug use. But that does not answer the pertinent question, which is whether the disclosure—even if not "voluntary"—is reasonable in relation to the purpose of ensuring the accuracy of the testing for alcohol or illicit drug use. We conclude that plaintiffs have failed to demonstrate that the revised policy violates Article I, section 9.

Affirmed on appeal and on cross-appeal.

**SCHUMAN, J.,** concurring.

I write separately for two reasons: to emphasize the narrowness of the holding in the majority opinion and to air

one disagreement with its analysis of the administrative search exception to the warrant requirement.

First, the majority's lucid and thorough opinion holds only this: the trial court did not err in concluding that the record plaintiffs made in this case (two affidavits) and the argument they relied on exclusively (the warrant requirement of Article I, section 9, of the Oregon Constitution does not have an "administrative search" exception) do not establish that defendant's drug testing program deprives their daughter of a constitutionally guaranteed right to be free from unreasonable searches and seizures. More to the point, the majority opinion does not establish that random, suspicionless drug tests of high school student athletes are constitutional; it holds only that *these plaintiffs* did not put on a case proving that *this program* is unconstitutional. With no deviation from the precedent that the majority opinion establishes, we could hold in a future case that some other student athlete drug testing program violates Article I, section 9, or that an identical program, challenged differently, does so.

Second, my disagreement with the majority's administrative search analysis revolves around the role of "reasonableness." Relying principally on *State v. Atkinson*, 298 Or 1, 688 P2d 832 (1984), and *Nelson v. Lane County*, 304 Or 97, 743 P2d 692 (1987), the majority holds that an administrative search is *per se* reasonable, and therefore lawful, if it proceeds under authority from a politically accountable lawmaking body, is structured so as to preclude the exercise of discretion by those who administer it, and is "reasonable in relation to its purpose." 184 Or App at 437 (quoting *State v. Rounds*, 73 Or App 148, 153, 698 P2d 71, *rev den,* 299 Or 663 (1985)). Reasonableness, in the majority's view, enters the analysis only in determining whether the search that the policy authorizes arguably promotes the accomplishment of the policy's objective and is limited in scope so as not to authorize a search that is unrelated to that objective; there is no requirement that the overall policy or the program itself be reasonable. 184 Or App at 437. I disagree. I maintain that a lawful administrative search must not only meet the three requirements developed in *Atkinson* and *Nelson*; it must also pass an overall reasonableness test implicit in those opinions.

This may seem a trivial quibble. Why should it matter whether the reasonableness inquiry enters the analysis at one stage rather than another? But consider this hypothetical administrative search program: a city council, in response to a well-documented epidemic of heroin and methamphetamine use, passes an ordinance creating a program under which official "drug monitors" are authorized to conduct thorough late night searches of homes, including searches of bedrooms and patdowns of their occupants, be they adults, children or infants. A computer selects addresses at random. The "drug monitors" must follow specific, rigid rules detailing every step of the process. None of the rules allows for any exercise of discretion. A citizen in whose home officers find specified illegal drugs must either submit to an intensive course of substance abuse counseling or forfeit all city-provided services including police and fire protection, public parks, and libraries. No other consequences occur; the "monitors" will not report search results to any law enforcement agencies.

Under the majority's test as I understand it, this administrative search program, despite a draconian protocol offensive to every civilized conception of privacy and liberty, is *per se* reasonable, and therefore lawful, because the search program is "reasonable in relation to its purpose," that is, the program is likely to promote the success of the policy's mission, and it does not authorize a search that is more intensive than necessary to accomplish the mission. Under an overall reasonableness test, on the other hand, the program obviously would fail.

Close examination of the existing Oregon administrative search jurisprudence supports an overall reasonableness requirement. Of particular importance is the court's explanation in *Nelson* of the function that politically accountable authority plays in the rationale underlying the administrative search exception. The court, quoting its opinion in *State v. Weist*, 302 Or 370, 376, 730 P2d 26 (1986), noted that the function of the *warrant* requirement in the criminal law context is "to subordinate the power of executive officers over the people and their houses, papers, and effects to legal controls beyond the executive branch itself." *Nelson*, 304 Or at 104. The court continued:

> "In *Atkinson*, we suggested that another method existed for administrative searches. We held that an administrative search conducted without individualized suspicion of wrongdoing could be valid if it were permitted by a 'source of the authority,' that is, a law or ordinance providing sufficient indications of the purposes and limits of executive authority, and if it were carried out pursuant to 'a properly authorized administrative program, designed and systematically administered' to control the discretion of non-supervisory officers."

*Nelson*, 304 Or at 104 (footnote and citation omitted). Thus, the legislation creating and limiting administrative search programs serves the same purpose as a judicial warrant: both act as a check on unrestrained executive power. Yet it is clear that the mere existence of a warrant does not make a search *per se* reasonable; the warrant itself is subject to a variety of requirements. It must be supported by "probable cause," it must be sufficiently specific, it cannot be stale, hearsay information it contains must be credible, and so forth. Those requirements add up to an overall requirement that the warrant establish the reasonableness of the search it authorizes. By the same token, the administrative analog to a warrant—legislative authorization—should also be subject to some limitation. It, too, must pass an overall reasonableness test. In the criminal context, in other words, the check on executive abuse is itself checked, and the same should hold true in the administrative context.

That analysis follows from the text of Article I, section 9, itself, which establishes the "right of the people" to be free from "unreasonable search." A rule that applies the reasonableness requirement only to the means-end relationship between the search and its objective may protect the people from poorly conceived or inefficient search programs, but it will not protect them from rational, carefully planned, effective search programs such as the one I hypothesize above that are obviously unreasonable in scope or objective.

Under either the majority's analysis or mine, there is much in defendant's search program that is unreasonable. What is reasonable about requiring an innocent 15-year-old girl, untainted by even an allegation of drug use, to urinate under direct observation, even if she is permitted while doing

so to use a "modesty drape," whatever that might be? What is reasonable, in fact, about teaching schoolchildren that they are presumed guilty of drug use until proven innocent? What is reasonable about a program that provides no predeprivation appeal process to guard against erroneously applied standards or, for example, chain-of-custody errors? About a program that would require a student taking prescription antidepressants that create what she knows to be a false positive "voluntarily" to reveal the fact that she takes the medication or face ineligibility for school sports? Those arguments, had they been made to the trial court, might have carried some weight. Further, much of what *is* reasonable about the program in this case—the need for it, the accuracy of its testing methods, and its likelihood of success in achieving its goals—is reasonable, as it were, by default: defendant put on evidence supporting those propositions, and plaintiffs, who had the burden of establishing unreasonableness, left them uncontradicted.

In other words, on this record, in this case, plaintiffs have not met their burden. They neither presented evidence of unreasonableness nor, for that matter, seriously argued that unreasonableness mattered. For that reason, I concur.