Argued and submitted December 23, 1999, reversed and remanded April 25, 2001

## STATE OF OREGON,
*Respondent,*

*v.*

## TAMLANE A. KENDALL,
*Appellant.*

(C9709-37346; CA A100683)

24 P3d 914

David C. Degner, Deputy Public Defender, argued the cause for appellant. With him on the briefs was David E. Groom, Public Defender.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DEITS, C. J.

Armstrong, J., concurring.

## DEITS, C. J.

Defendant appeals a judgment of conviction for possession of a controlled substance. ORS 475.992. He assigns error to the trial court's denial of his motion to suppress. The trial court based its denial of the motion on its conclusion that defendant abandoned any protectable privacy or possessory interest in his property. The state cross-assigns error to the trial court's decision, arguing that an alternative basis for denying the motion to suppress was that the evidence in question was discovered pursuant to a valid inventory. We reverse and remand.

■ We state the facts as found by the trial court when supported by evidence and, when the trial court has not made findings concerning facts that were in dispute, we presume the facts were decided in a manner consistent with the trial court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). While patrolling in the area of S.E. Foster Road and 97th Avenue in Portland, Officer Francis observed defendant riding his bicycle. Francis was familiar with defendant and knew that there was an outstanding warrant for his arrest. Francis yelled at defendant to stop; in response, defendant sped up and rode his bicycle away from Francis. Defendant was apparently attempting to elude Francis, who pursued him. Defendant repeatedly circled the same block in the area of S.E. Foster Road and 99th Avenue, with Francis in pursuit. Defendant cut though the same yard at 9915 S.E. Foster Road, which was located along the block that he and Francis were circling, at least three times. After passing the house at 9915 S.E. Foster Road a third time, defendant threw his bicycle into some bushes on the lot that adjoined the residence and then ran into the house at that address. Francis testified:

> "It's when we had just passed the house again, 9915. And he went about maybe—see 9915 has a—like a fenced in lot connected to it where these guys in the house are storing junked cars. So he went around that lot and cut up the curb. Then it's kind of overgrown with bushes, sticker bushes and some regular tree-like shrubs or something like that. Kind of an overgrown area. That's where he threw the bike down right there."

Francis said that he saw defendant run into the house, which was about one-half block away. Apparently, defendant knew the residents of the house. Francis approached the house and called for police assistance. While waiting for assistance, Francis removed defendant's bicycle from the bushes and placed it near his patrol car. When police assistance arrived, Francis and another officer went to the door of the house and asked to see defendant. After a few minutes, defendant came out of the house and Francis arrested him.

A leather zippered shaving kit, which Francis described as a small travel bag, was attached by a bungee cord to the back of defendant's bicycle. At some point before leaving 9915 S.E. Foster Road, Francis opened the shaving kit and inventoried its contents. Inside, Francis found $9 in quarters, a pair of shorts, defendant's eyeglasses, and a small, opaque plastic key case. Francis opened the key case and discovered a bindle of "brown chunky powder substance," which the police laboratory later identified as methamphetamine.

At trial for possession of a controlled substance, defendant moved to suppress all evidence obtained from Francis's inventory, including the evidence found in the key case, arguing, *inter alia*, that the search violated Article I, section 9, of the Oregon Constitution. In response, the state argued that defendant had abandoned any protectable privacy or possessory interests in the bicycle and the bag. In the alternative, it contended that, even if defendant had not abandoned his interests, the officer discovered the methamphetamine pursuant to a valid police inventory policy. The trial court first rejected the state's argument that the search of the key case was part of a valid inventory. The court then denied defendant's motion to suppress, concluding that defendant had abandoned his privacy or possessory interests and, thus, the officer's search of defendant's property was permissible. We turn first to the issue of abandonment.

In *State v. Knox*, 160 Or App 668, 675-76, 984 P2d 294, *rev den* 329 Or 527 (1999), we explained:

> " 'Abandonment' is a voluntary relinquishment of posses-
> sory and privacy interests in an article of property that nec-
> essarily involves both legal and factual questions. For
> purposes of 'abandonment' in the constitutional sense
> under the Fourth Amendment, the question is whether a
> defendant, in discarding the property, has relinquished a
> reasonable expectation of privacy so that the seizure is
> reasonable. In essence, what is abandoned is not necessar-
> ily the defendant's property interest under the law of prop-
> erty but the reasonable expectation of privacy in the prop-
> erty. However, if the possessor has been coerced by illegal
> police conduct, courts will not consider the property to be
> abandoned in the constitutional sense." (Citations omitted.)

We went on to explain that the question under Article I, sec-
tion 9, is similar: "Has defendant relinquished his privacy or
possessory interest in the [property] under circumstances
that makes its seizure reasonable?" *Id.* at 676.

The critical inquiry here is whether, under all of the
circumstances, defendant abandoned his privacy or posses-
sory interest in the bicycle and the attached bag. *See State v.
Kauffman,* 162 Or App 402, 407, 986 P2d 696 (1999), *rev den*
329 Or 650 (2000) (we examine the totality of the circum-
stances in determining whether a defendant has abandoned
a protected possessory or privacy interest). We note at the
outset that defendant does not contend that Francis's pursuit
and arrest of defendant was illegal in any respect, and, con-
sequently, we must decide only whether defendant intended
to forgo the exercise of his privacy and possessory interests.
*See State v. Ray,* 164 Or App 145, 152 n 9, 990 P2d 365 (1999)
(noting that the determination of whether a defendant has
abandoned a constitutionally protected privacy interest after
*lawful* police conduct turns on whether the defendant
intended to forgo the exercise of his or her possessory and pri-
vacy interests).

After considering the entire circumstances here, we
conclude that defendant did not abandon his privacy or pos-
sessory interests in the bicycle and the attached bag.
Although defendant separated himself from his possessions
while being pursued by the police, he placed those posses-
sions in the bushes on private property rather than in a place
that was completely open to the public and where it was

likely that members of the public would inspect them. *See State v. Belcher*, 89 Or App 401, 405, 749 P2d 591, *aff'd* 306 Or 343, 759 P2d 1096 (1988) (defendant had abandoned privacy interest after fleeing police and leaving his pack "in a public place"). The exact relationship of the fenced lot to the property at 9915 S.E. Foster Road is not entirely clear from the record. The lot was either a part of the property on which the house was located or, at a minimum, it was used by the residents of the house for the storage of junked vehicles. Further, as noted above, defendant remained in the general area where he placed his bicycle—he fled to a house that was about one-half block away.

Another part of the circumstances that we consider significant here is the nature of the property involved. Defendant placed his bicycle, a type of vehicle, on the lot. He then left it there and went inside a nearby house. It is common for a person to leave property of this nature outdoors, unattended. Our statutes, in fact, commonly treat vehicles differently than other property that is left unattended. *Compare* ORS 819.110 (vehicles deemed *abandoned* if there is reason to believe the vehicle is in fact abandoned and it is left for more than 24 hours on any public way without authorization) *with* ORS 98.005 (where money or goods are found and the owner is unknown, such property is considered lost). *See also* Wayne R. LaFave, 2 *Search and Seizure* § 2.5(a) at 553 (3d ed 1996) ("[A] car and an overcoat are different; one can hardly expect privacy in an overcoat left on the street, but cars are regularly parked on the street for brief periods of time without an expectation that they will thereby be subject to entry."). Considering the entire circumstances here, we do not believe that defendant's actions demonstrate an intent to relinquish his privacy or possessory interest in the items.

Finally, we note that, although an officer's treatment of property does not determine whether a defendant has abandoned a privacy or possessory interest, Francis's handling of the property reflects his understanding from defendant's behavior that defendant did not relinquish his interests in the property. Francis stated that he took the bicycle and the bag and placed them by his patrol car in order to *store them* for defendant. Under the entire circumstances

here, we hold that defendant did not abandon his privacy or possessory interests in his bicycle and bag and, accordingly, that the search and seizure of his property cannot be justified on that basis.

This case is distinguishable from our decision today in *State v. Dickson*, 173 Or App 567, 24 P3d 909 (2001), which also addresses the question of whether a defendant abandons privacy and possessory interests in property that he discards when fleeing the police. In *Dickson*, the defendant was leaving a residence when police officers left their vehicles, "yelling out that they were police and that they had a search warrant." *Id.* at 569. The defendant then dropped his backpack in plain sight of the officers while he was immediately outside of the residence from which he had fled. Unlike this case, in *Dickson*, "the record [did] not show that defendant took any action indicating that he was attempting to maintain control of the backpack, such as hiding it in a place from which he might later be able to retrieve it." *Id.* at 575. Similarly, in *Dickson*, even though the defendant dropped his backpack in an area where members of the public might be unlikely to seize and search it, the defendant's act of dropping the backpack was undertaken with an awareness that the police had a search warrant and, in all likelihood, would search the backpack if he dropped it as he fled. *Cf. State v. Rounds*, 73 Or App 148, 152, 698 P2d 71, *rev den* 299 Or 663 (1985) (backpack was not abandoned where defendant had left it closed in the private driveway of his grandfather's residence). Finally, as noted above, the nature of the property at issue is significant. It is more likely that a backpack left on the ground would be inspected than it would be for a vehicle.

We turn now to the inventory argument. In its cross-assignment of error, the state argues that the trial court erred in ruling that the evidence contained in defendant's key case was not discovered pursuant to a valid inventory of defendant's property. We review the trial court's determination of whether an inventory meets constitutional standards for errors of law, taking as binding the trial court's findings of historical facts if evidence supports them. *State v. Boone*, 327 Or 307, 309, 959 P2d 76 (1998). If findings are not made on all issues, and there is evidence from which the facts could be

decided in more than one way, we will presume that the facts were decided in a manner consistent with the trial court's decision. *Ball*, 250 Or at 487.

■ ■ An inventory of the possessions of a person being taken into custody may be conducted without violating Article I, section 9, of the Oregon Constitution, if it is made pursuant to "a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion[.]" *State v. Atkinson*, 298 Or 1, 10, 688 P2d 832 (1984). Where the record demonstrates that the inventory deviates from the established policy, the inventory is invalid. *Id.*

■ In this case, Francis performed the inventory pursuant to Portland City Code section 14.10.040, which provides, in relevant part:

"A. A police officer will inventory the personal property in the possession of a person taken into police custody and such inventory will be conducted whenever:

"1. Such person will be * * * transported in the secure portion of a police vehicle;

"* * * * *

"C. Inventories of the personal property in the possession of such persons will be conducted according to the following procedures:

"* * * * *

"3. A closed container in the possession of such person will have its contents inventoried only when:

"a. The closed container is to be placed in the immediate possession of such person at the time that person is placed in the secure portion of a custodial facility, police vehicle or secure police holding room; [or]

"* * * * *

"c. The closed container is designed for carrying money and/or small valuables on or about the person including, but not limited to, closed purses, closed coin purses, closed wallets and closed fanny packs."

The state argues that Francis was justified in opening defendant's key case, pursuant to Portland City Code section 14.10.040(C)(3)(c),[1] because a key case is "designed for carrying money and/or small valuables."[2] However, under the Portland ordinance at issue, a "valuable" is defined as:

"1. Cash money of an aggregate amount of $50 or more; or

"2. Individual items of personal property with a value of over $500." PCC § 14.10.020.

There is no evidence in the record that the key case involved here was designed to hold anything but a key. A key is not a "valuable" under the ordinance because it is not $50 or more in cash, nor is it an individual item of personal property with a value of over $500. The state argues that a key is itself an item of value because it often gives the holder access to valuables, such as a home or an automobile. We disagree. In view of the specific definition of "valuables" in the ordinance and the purpose of the inventory policy, which is to safeguard a defendant's possessions and to protect the police from liability, we do not believe that the term, as used in the city's ordinance, was intended to include items the only value of which is to allow access to other items that may be valuables. We conclude that the ordinance's use of the term "valuables" includes only items that have the specified value in and of themselves. The opening of defendant's key case was not permissible under the Portland inventory ordinance, and the trial court correctly ruled that the contents of the key case were inadmissible. Because the city's inventory policy does not authorize the opening of the key case and, as discussed above, defendant did not abandon his possessory and privacy interests in the bag, we hold that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[1] On appeal, the state does not separately rely on Portland City Code section 14.10.040(C)(3)(a) to justify the opening of the key case.

[2] Defendant does not dispute that Francis was justified in opening defendant's shaving kit under Portland City Code section 14.10.40(C)(3)(c), so we confine our analysis to the opening of the key case.

**ARMSTRONG, J.,** concurring.

I concur in the majority's decision, because it is consistent with our current way of analyzing the issues in this case. I write simply to note my belief that we should abandon the analysis of abandonment under Article I, section 9, of the Oregon Constitution, on which the majority relies.

Article I, section 9, of the Oregon Constitution, provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

I believe that we have been constructing a body of law on abandonment that has had the effect of removing the very protection that Article I, section 9, is intended to secure for people. The facts of the companion case to this case, *State v. Dickson*, 173 Or App 567, 24 P3d 909 (2001), provide an excellent illustration of my point.

When the defendant in *Dickson* dropped his backpack, he abandoned his backpack to whatever consequence *lawfully* could follow from that act. Article I, section 9, is part of the law, and a very important part, that properly bears on what *lawfully* could be done to the defendant's backpack as a result of his act. However, by constructing a separate body of law on abandonment of rights under Article I, section 9, we have removed from the analytical equation the very law that is intended to apply to police conduct toward people and their property and effects.

The following hypothetical may help illustrate the problem. Assume that rival gang members are involved in a fight. Included among the group on one side is an undercover police officer. The other group is overwhelmed, and one of their number drops his backpack to escape from the crowd, expecting the act of dropping the backpack to lighten his load sufficiently to enable him to get away. Assume further that someone other than the undercover police officer picks the

backpack up and, treating it as spoils of the fight, takes it home.

If the owner later brought a replevin or conversion action against the person who took his backpack, the court would analyze the relevant property law to determine if the owner had abandoned his backpack. In resolving that issue, the fact that the owner might expect the backpack to be attractive or of interest to the rival gang members should not bear on whether the owner had abandoned it. As a matter of policy, the law would favor the owner's decision to drop the backpack and to rely on the law and the legal system to protect his interests in it. In other words, I would be surprised if the result of the case would be a decision in favor of the person who took the backpack, on the ground that the owner had abandoned it.

Assume, alternatively, that the undercover police officer picked up the backpack, and suspecting that it contained contraband, opened it. The officer's act in doing that should be analyzed under Article I, section 9. There should not be a special body of abandonment law involving Article I, section 9, that would remove that provision from the body of law that bears on the lawfulness of the officer's act. The purpose of Article I, section 9, is to secure protection against the government. The government is entitled to be treated as is anyone else with regard to rights in property, subject to the *further* constraint imposed by Article I, section 9. Our special body of abandonment law, a body of law that is explicitly distinct from property law, has the effect of removing from the evaluation of the legality of governmental conduct toward property the very body of law that is intended to secure property *against* governmental intrusion. That appears quite paradoxical to me.

The protection secured by Article I, section 9, is secured to all people, including those who engage in criminal conduct or who are accused or suspected of crime. Consequently, it should not matter if the person who dropped the backpack knew that police officers were in the crowd or that police officers would have an interest in or be able to pick up the backpack. By dropping the backpack, the owner subjects it to whatever handling by others that the law allows. That

body of law supplies the context in which his act should be judged. In other words, the owner "abandons" his backpack within the context of the law that governs his act. Article I, section 9, is a critical part of that legal context. Again, our abandonment law removes Article I, section 9, from the law by which the legality of the police conduct toward property is to be judged, even though the sole purpose of Article I, section 9, is to supply the law that governs police conduct toward property, and our abandonment law does that while continuing to recognize that the owner has a property interest in the backpack, which is the interest that is to be protected against police intrusion by Article I, section 9. That makes no sense.

*State v. Belcher*, 89 Or App 401, 749 P2d 591, *aff'd* 306 Or 343, 759 P2d 1096 (1988), appears to be the case in which we began the process of creating a distinctive body of abandonment law under Article I, section 9. It is easy to show that the effort to do that in that case was completely unnecessary, as the Supreme Court demonstrated in affirming our decision in the case. The case involved police scrutiny of the contents of a backpack that had been left by the defendant in the course of a fight at a parking lot. We said that the defendant had abandoned his protection under Article I, section 9, because the defendant should have anticipated that leaving his backpack in the parking lot would subject it to scrutiny. We could, and should, have easily said that police did not violate Article I, section 9, by opening the backpack in an effort to determine its owner, because, as a matter of property law, they had the lawful authority to do that, and, as a consequence, the intrusion did not constitute an unreasonable search proscribed by Article I, section 9.That is essentially the way the Supreme Court treated the issue in affirming our decision in *Belcher*, 306 Or 345-46, and the way that it resolved the same issue in *State v. Pidcock*, 306 Or 335, 339-42, 759 P2d 1092 (1988). *See also* ORS 98.005-.025 (describes rights and obligations of finder and owner of found property). In other words, the Supreme Court appears to have viewed the issue in the way that I suggest that we should, which should give us pause about continuing down the track that we are on.

*Dickson* should be analyzed similarly. It should not turn on abandonment but, rather, on whether the police violated Article I, section 9. The state offered arguments in *Dickson* why the search did not violate that provision. For all I know, those arguments might be correct, but *Dickson* and similar cases should be analyzed on that basis, not on the basis of our independently developed law on abandonment.