Argued and submitted June 26, 2019, affirmed June 17, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MITCHELL E. MONTIEL-DELVALLE,
aka Mitchell E. Montiel-Del Valle,
*Defendant-Appellant.*

Washington County Circuit Court
16CR32806; A165347

468 P3d 995

After fleeing the scene of a car accident, defendant was convicted of failure to perform the duties of a driver to injured persons, ORS 811.705, and failure to perform the duties of a driver when property is damaged, ORS 811.700. On appeal, defendant challenges the trial court's denial of his motions to suppress (1) evidence derived from a police officer's search of his car that led to the officer determining defendant's identity, and (2) defendant's post-arrest statements regarding his physical injuries, some of which were made before he was advised of his *Miranda* rights and some of which were made after he invoked his right to counsel. *Held*: The trial court did not err. When defendant left his car in a public road intersection in severely damaged condition, he abandoned it in the constitutional sense. As for defendant's post-arrest statements, the officer's questions about defendant's medical condition served a legitimate administrative purpose and, under the booking question exception, did not constitute interrogation for *Miranda* purposes.

Affirmed.

Andrew Erwin, Judge.

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

E. Nani Apo, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Egan, Chief Judge, and Mooney, Judge.*

_____

* Egan, C. J., *vice* Hadlock, J. pro tempore.

AOYAGI, P. J.

Affirmed.

## AOYAGI, P. J.

After fleeing the scene of a car accident, defendant was convicted of failure to perform the duties of a driver to injured persons, ORS 811.705, and failure to perform the duties of a driver when property is damaged, ORS 811.700. On appeal, he challenges the trial court's denial of his motions to suppress (1) evidence derived from a police officer's search of his car at the accident scene, and (2) statements that he made to the same police officer following his arrest. We conclude that the trial court did not err in denying defendant's first motion because defendant had abandoned his car in the constitutional sense before the officer searched it. We conclude that the trial court did not err in denying the second motion because the officer's post-arrest questions fell within the booking question exception to *Miranda*'s protections. Accordingly, we affirm.

### FACTS

"Determination of the legality of searches and seizures depends largely on the facts of each case." *State v. Ehly*, 317 Or 66, 74, 854 P2d 421 (1993). "Our function is to decide whether the trial court applied legal principles correctly to those facts." *Id*. at 75. In reviewing the denial of a motion to suppress, we are bound by the trial court's findings of historical fact if there is constitutionally sufficient evidence to support them. *Id*. "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id*. We state the facts in accordance with the foregoing standard.

Shortly after 1:00 a.m., a gold Toyota Camry and a black Dodge Charger crashed in an intersection in Washington County. Officer Ganci responded to the scene. Both cars were heavily damaged, if not totaled. A bystander was helping the Camry's driver, who was injured, out of his car. The Charger was in the intersection with no one in it; it had massive front-end damage, and the driver and passenger air bags had deployed. According to a witness, the Charger's driver ran a "solid red light" and "T-boned" the

Camry, after which a "Hispanic" man and woman took off on foot from the Charger, and at least one of them was limping. The condition of the cars was consistent with the occupants sustaining injuries. Both cars had to be towed away, and the Camry's driver was taken to the hospital.

Ganci looked inside the Charger to try to identify its former occupants. Ganci removed a wallet and a cell phone from the center console area, because the car was going to be towed and "we don't allow valuables to go to the tow companies." Ganci found defendant's driver's license in the wallet. He also found a registration slip with defendant's name in the car, and he found paystubs from Chevy's Mexican Restaurant with defendant's name and home address on them in multiple locations in the car (the glove box, the door pockets, and the pockets of some Chevy's aprons).

When Ganci went off shift at 6:00 a.m., his initial efforts to locate defendant had proved unsuccessful. Ganci returned to work at 8:00 p.m. (14 hours later) and resumed his efforts to locate defendant. Using the information that he had found in the Charger, Ganci went to Chevy's, where he talked to multiple people, including defendant's uncle. Several of defendant's coworkers mentioned that defendant had been in a crash the previous night, one said that defendant had asked his help in making an insurance claim, and another told Ganci that defendant had gone with some coworkers to a bar called Malone's the previous night. Ganci went to Malone's, where a bouncer told him that a "Hispanic" male and female had left the bar around 1:00 a.m. in a black Charger.

Defendant was arrested at his home in Portland shortly before midnight (about 22 hours after the accident) and taken to a Portland police station, where Ganci took custody of him. The first question that Ganci asked defendant was whether he was injured in any way. Defendant said that he was sore all over his body, legs, and shoulders, and, "My head hurts pretty bad." Ganci asked why his head hurt, to which defendant responded, "I hit it on the steering wheel during a crash." Ganci asked defendant if he needed medical attention, and defendant said, "No." Ganci asked defendant if his shoulders were so badly injured that

Ganci needed to use two sets of handcuffs, to make them a bit more comfortable, and defendant said no. At that point, Ganci handcuffed defendant and gave him *Miranda* warnings. Defendant invoked his right to counsel.

As defendant walked to the patrol car, a distance of about 100 feet, Ganci noticed him limping.[1] Ganci placed defendant in his patrol car and drove him to the Washington County Jail, which was about a 50-minute drive. About midway through the drive, Ganci turned down the radio and asked, "Hey, you still doing okay back there?" Ganci asked because it was a long drive, in handcuffs, and he wanted to make sure that defendant was medically okay. Defendant responded, "My head just hurts really bad from hitting it on the steering wheel. I hit it really hard." Ganci asked defendant if he needed to go to the doctor, and defendant said no. Ganci told him that he would have the nurse at the jail check him out when they got there.

When they arrived at the jail, Ganci lent his phone to defendant to make a private call to his father. While placing the call, defendant spontaneously told Ganci that his ankle hurt, and Ganci asked why or what was wrong with it.[2] Defendant said that "it got messed up in the pedals during the crash, but it was also a reoccurring injury." Ganci told defendant that "he was not inquiring about the crash and only his medical needs."

During booking, defendant was photographed without his shirt to document his existing injuries and protect against a later claim that he had injuries that required going to the hospital and was denied going to the hospital. While defendant was being photographed, Ganci could see swelling on his body, and he could tell that defendant was

---

[1] As they walked, Ganci and defendant had a brief exchange regarding the condition of the female from the crash and of the other driver from the crash. The trial court suppressed those statements, and defendant does not argue that they are relevant to his later statements, so we omit them from the narrative.

[2] The exact phrasing of Ganci's question in response to defendant saying that his ankle hurt is not established by the record. Ganci initially testified that, when defendant told him that his ankle hurt, "I asked him why his ankle hurts." Later, he confirmed that he had "asked what was wrong with his ankle, right, or something like that, it's not in quotes, but *** what was wrong with his ankle, something like that."

in pain. Ganci asked defendant "if he was still doing okay." Defendant responded that "he had pain all over his right side of his body from the crash," described the movement of his body in the crash, and said that he "felt sore all day" and that his right hand must have hit something because it was swollen. Ganci reminded defendant that he had requested a lawyer and told him that "talking about parts of the crash would be unwise." Ganci asked defendant what his pain was on a scale of 0 to 10, with 0 being no pain and 10 being the worst pain he had ever felt, and defendant responded that it was a 6.

A grand jury indicted defendant on one count of failure to perform the duties of a driver to injured persons and one count of failure to perform the duties of a driver when property is damaged. Defendant moved to suppress all evidence derived from the warrantless search of the Charger—including statements by defendant's coworkers, evidence regarding an insurance claim related to the accident, and defendant's statements to Ganci—as derivative of an unlawful search. Defendant separately moved to suppress his statements to Ganci, both before he received *Miranda* warnings and after he invoked his right to counsel, as violating his rights against self-incrimination.

The trial court held a hearing on defendant's motions to suppress. In addition to the testimony reflected in the facts already described, Ganci testified that he always asks medical questions before booking people into jail. The jail will not take custody of someone who is in substantial pain or needs medical care. There is also the risk of someone dying in transport. The "last thing" that Ganci wanted was for defendant to "go sit in a jail while he's, you know, bleeding out *** internally from the day and didn't even notice it. So we always ask medical questions." Given the seriousness of the car crash and defendant's visible limp, Ganci would have asked defendant about his medical condition regardless of any statements that defendant made. Ganci believed that he had a duty to ascertain whether defendant was injured, and, by asking questions, he was assessing whether defendant needed to go to the hospital instead of the jail. Ganci also intended to relay—and did relay—the

information to the jail's nurse. Ganci expressly denied that he was asking questions to try to elicit information about the crash. Instead, he testified, he was "just try[ing] to figure out [defendant's] medical needs in case we needed to go to the hospital before jail, or *** if he was even suited to go to the jail."

As for the one or two "why" questions that Ganci asked defendant, Ganci testified that he asks clarifying questions like "why" to obtain further information about the person's medical condition: "Because usually if someone tells me their head hurts, you say, 'Why?' They're like, 'I have a headache.' Not, is it why it hurt or how it got hurt." When Ganci asked defendant why his head hurt, he was inquiring about the reason that it hurt, not how he injured it, and did not intend to elicit an incriminating response—he asks that question "for everybody" and "never ever really get[s] an incriminating response to that." Similarly, when Ganci asked defendant why his ankle hurt or what was wrong with it, he expected defendant to say that he had sprained it or the like, not to make an incriminating statement about the mechanism of injury.

The trial court denied both motions to suppress. As to the first motion, it concluded that defendant had abandoned any constitutionally protected interest in the Charger when he left it at the accident scene, relying on *State v. Green*, 44 Or App 253, 605 P2d 746 (1980). As to the second motion, it concluded that Ganci's questions fell within the "booking question" exception to *Miranda*'s protections, because they were administrative questions regarding defendant's medical condition at the time of arrest and booking and were not designed to elicit incriminating information. The court noted the liability issues that could arise if the officer and the jail failed to consider and document defendant's physical injuries at the time of booking.

Upon the denial of his motions to suppress, defendant entered a conditional guilty plea—pleading guilty to both counts of the indictment but reserving the right to appeal the suppression rulings—and was convicted. On appeal, defendant raises two assignments of error, the first challenging the denial of his motion to suppress evidence

derived from the information found in the Charger, and the second challenging the denial of his motion to suppress his post-arrest statements to Ganci.

MOTION TO SUPPRESS—SEARCH OF CAR

Defendant contends that the search of the Charger violated his rights under Article I, section 9, of the Oregon Constitution.[3] Article I, section 9, protects people against unreasonable searches and seizures. "A defendant who has actual or constructive possession of property immediately before it is searched has a constitutionally protected possessory interest in that property." *State v. Standish*, 197 Or App 96, 99-100, 104 P3d 624, *rev dismissed as improvidently allowed*, 339 Or 450 (2005). A defendant may abandon his constitutionally protected interests in property, however, by voluntarily manifesting an intention to relinquish them, in which case a warrantless search of the property does not violate his rights. *State v. Cook*, 332 Or 601, 607, 34 P3d 156 (2001). "[T]he determination whether a defendant has relinquished a constitutionally protected interest in an article of property involves both factual and legal questions, which this court reviews in the same manner that it reviews other search or seizure questions arising under Article I, section 9." *Id*.

We begin with an overview of relevant case law that illustrates the types of facts sufficient—and insufficient—to establish abandonment for constitutional purposes.

In *Green*, two men saw a Plymouth leaving their friend's driveway and soon discovered that their friend's house had been burgled and ransacked. 44 Or App at 258-59. The two men pursued the Plymouth and caught up to it at a traffic light, where one man approached the driver and saw his friend's property in the car. *Id.* at 259. The Plymouth took off when the light turned green. *Id.* The two men continued pursuit, until the Plymouth reached a dead end, at which point both occupants of the Plymouth "bailed out" and ran. *Id.* A police officer arrived at the scene and

---

[3] Defendant cited both Article I, section 9, and the Fourth Amendment to the United States Constitution in his motion to the trial court, but his argument on appeal is limited to Article I, section 9.

found the car parked in a private driveway near the dead end. *Id*. at 258. The defendant was the registered owner of the car, which the officer impounded and had towed. *Id*. at 259. At the tow lot, another officer searched the car, because he had heard about the reported burglary. *Id*. In the trunk, he found a pistol inside a paper sack. *Id*. The pistol was stolen and had the defendant's fingerprints on it. *Id*.

The defendant was charged with a firearm crime related to the pistol. *Id*. at 255. He moved to suppress the pistol, but the trial court denied the motion. *Id*. at 258. We affirmed, holding that the defendant had abandoned the Plymouth "for constitutional purposes"—which we distinguished from abandonment "in the common law sense"—and therefore could not challenge the search. *Id*. at 259. Specifically, we said:

> "Where two suspected thieves have been pursued from the scene of an apparent burglary and finally leap from their car and flee, they have abandoned any expectation of privacy with respect to the car in the same way that a fleeing robber who drops a bag of loot has abandoned the loot. Society is not prepared to recognize as reasonable— and the constitution does not compel it to recognize as reasonable—any subjective expectation of (or hope for) privacy the fleeing burglars may have retained in the car they left behind."

*Id*. at 259-60.

Similarly, in *State v. Belcher*, 306 Or 343, 759 P2d 1096 (1988), the defendant was involved in a fight in a tavern parking lot, and, as police officers arrived, he fled the scene, leaving behind a backpack. Officers searched the backpack, looking for identification, and found stolen property. *Id*. at 345. The trial court denied the defendant's motion to suppress, finding that he had "left for his home, leaving the pack behind," and that there was "no indication when if ever he decided to return for it." *Id*. The Supreme Court affirmed, holding that the defendant had abandoned the backpack for purposes of Article I, section 9. *Id*. at 346.

By contrast, in *Cook*, an officer saw the defendant leaning over a duffel bag near a dumpster and sorting clothing. 332 Or at 603. He asked what he was doing, and the

defendant responded that the bag and clothes were not his but that he had found them and was looking to see if he could use any of them. *Id*. at 604. The officer asked the defendant to "step out" of the dumpster area, which he did, leaving the bag and clothes where they were. *Id*. A later search revealed that the bag belonged to the defendant and contained methamphetamine. *Id*. The Supreme Court held that the evidence had to be suppressed. *Id*. at 608-09. When the defendant stepped away from the bag and clothes, he relinquished immediate physical possession of the items, but only because he was complying with the officer's instruction to "step out" of the dumpster area. *Id*. As for his denial of ownership, that was not enough to establish that he "intended to relinquish all his constitutionally protected interests in those items." *Id*. at 608. "In *Cook*, the defendant disclaimed ownership of the items but, at the same time, actively asserted a possessory interest in them," specifically "a protected nonownership interest," when he "[told] the officers that he might want to keep some of the clothes" and "actually possess[ed] and assert[ed] control over the property." *Standish*, 197 Or App at 101.

Likewise, in *State v. Brown*, 273 Or App 347, 351, 359 P3d 413 (2015), we held that the defendant had not abandoned a McDonald's bag for constitutional purposes when he set the bag upright on the flat top of a compressor, alongside a just-purchased bottle of water, while talking to a police officer outside a convenience store, and then left the bag and water there for 10-20 minutes while he went across the street with the officer at the officer's request. The defendant did not "treat the bag as if it were trash," such as by wadding it up. *Id*. at 352. He physically distanced himself from it only to comply with the officer's request, and he stayed nearby and was not gone that long. *Id*. at 353. He also did not say anything to the officer to indicate that he intended to leave the bag behind. *Id*. Under the circumstances, it was "as likely" that he had left the bag and water on the compressor top "out of inadvertence (perhaps because he was distracted by his conversation with [the officer])" as it was "that he had discarded the bag." *Id*.

Finally, a defendant's relinquishment of his constitutionally protected rights in property need not be permanent to defeat a motion to suppress. In *State v. Ipsen*, 288

Or App 395, 406 P3d 105 (2017), we held that the defendant had abandoned a hidden camera for constitutional purposes when he left it plugged into an electrical outlet in a coffee shop bathroom for several days. The defendant argued "that the nature of the device—a hidden camera—demonstrate[d] his intent to retrieve it," but we rejected that argument, noting that the "defendant's intent to relinquish his constitutionally protected rights need not have been permanent." *Id*. at 400. Leaving the camera "in plain view, in a bathroom available to the general public, for an extended period of time, and where it was accessible to anyone who entered the bathroom" was enough to establish abandonment for constitutional purposes. *Id*.

We agree with the trial court that this case is nearly identical to *Green*. Defendant argues for a different result, contending that the totality of the circumstances suggest that he "sought to escape criminal liability by leaving the scene of an accident" but "that nothing indicates that he intended to leave his car and its contents for anyone to enter and rummage through or take as they saw fit." The same could be said, however, of the defendant in *Green*. He too may have subjectively intended to come back for his car at some point, but, by leaving it as he did, he "abandoned any expectation of privacy with respect to the car in the same way that a fleeing robber who drops a bag of loot has abandoned the loot." *Green*, 44 Or App at 259. Given that the Charger was heavily damaged or totaled, undriveable, and located in a public road intersection, it is difficult to see how defendant could have subjectively expected it to remain undisturbed. But, as with the defendant in *Green*, even if defendant "subjectively expected (or hoped)" that the Charger might remain undisturbed until and unless he saw fit to return for it, that is an expectation that "[s]ociety is not prepared to recognize as reasonable" and that "the constitution does not compel it to recognize as reasonable[.]" *Id*. at 260.

All of the factors relevant to whether a defendant manifested an intention to relinquish a constitutionally protected interest in property support the trial court's ruling in this case. Those factors include: (1) "whether the defendant separated himself from the property as a result of police instruction or illegal police conduct," (2) "whether

the defendant left the property on public or private property," (3) "whether the defendant made any attempt to hide the property or in any other way manifest an intention to the police that he was attempting to maintain control over it," (4) "whether the defendant has left his property under circumstances which objectively make it likely that others will inspect it," (5) "whether the defendant has placed the item in plain view," and (6) "whether the defendant gave up his rights to control the disposition of the property." *Ipsen*, 288 Or App at 399-400 (internal quotation marks and alterations omitted).

Here, defendant abandoned the Charger of his own accord, not as the result of a police instruction or illegal police conduct. He not only left it on public property, but he left it disabled in a public road intersection. He made no attempt to hide it or otherwise manifest an intention to the police that he was attempting to maintain control over it. He left it under circumstances in which it was likely that others would inspect it—being heavily damaged and disabled and left in a public road intersection where it posed an immediate public safety hazard. It was in plain view. And defendant gave up his right to control the Charger's disposition in circumstances requiring immediate disposition, that is, knowing that someone would have to take control of the car and do something with it in short order. *See State v. Kauffman*, 162 Or App 402, 408, 986 P2d 696 (1999), *rev den*, 329 Or 650 (2000) ("Defendant surrendered any control that he may have had in the bag when he chose to turn it over to strangers and then walk off down the railroad tracks.").

Defendant compares this case to *Kendall*, but that comparison is inapt. In *Kendall*, we held that the defendant had not abandoned his bicycle, which had a small bag strapped to it, by placing it under bushes on private property and going inside the house. 173 Or App 487, 489, 24 P3d 914 (2001). He did not leave the bicycle "in a place that was completely open to the public and where it was likely that members of the public would inspect [it]." *Id*. at 491-92. It is "common" to leave a bicycle "outdoors, unattended," in that manner. *Id*. at 492. And, although not determinative, an officer specifically testified that he took the bicycle and placed it in his trunk to "store" it for the defendant. *Id*. Here,

by contrast, defendant left a heavily damaged or totaled car in a place completely open to the public, where it was likely to be inspected. There was nothing "common" about how or where he left it. And Ganci indicated that he processed the car as he did because it was an accident scene and he was investigating a possible crime, not to protect defendant's property for him.[4]

Lastly, defendant suggests that *Green* is not "useful as precedent in interpreting and applying Article I, section 9," because it cites two federal cases and was decided "before Oregon appellate courts had fully developed the principle of independence from Fourth Amendment jurisprudence." We disagree. We have previously rejected a similar argument. *See State v. Belcher*, 89 Or App 401, 404 n 1, 749 P2d 591 (en banc), *aff'd*, 306 Or 343, 759 P2d 1096 (1988) (rejecting an argument that *Green*'s "abandonment for constitutional purposes" rationale is limited to federal constitutional analysis). Moreover, the analysis in *Green* is consistent with the intervening 40 years of "abandonment" caselaw under Article I, section 9.

The trial court did not err in denying defendant's motion to suppress evidence derived from the information that Ganci found in the Charger.

## MOTION TO SUPPRESS—
## POST-ARREST STATEMENTS

Defendant next argues that the trial court erred in denying his motion to suppress his post-arrest statements to Ganci, because, under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, Ganci impermissibly interrogated him both before giving *Miranda* warnings and after defendant had invoked his right to counsel. The trial court rejected that argument, concluding that Ganci's post-arrest questions did not constitute "interrogation" for purposes of Article I,

---

[4] Ganci removed two items from the car—a wallet and a cell phone—but he testified that he did so because the car was going to be towed and "we don't allow valuables to go to the tow companies." Although that policy may be partially driven by a desire to "safeguard" valuables, the officer's compliance with a generally applicable policy of not leaving valuables in cars being towed does not assist defendant in this case.

section 12, or the Fifth Amendment, because they fell within the booking question exception to *Miranda*'s protections.

Article I, section 12, provides that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself." The Fifth Amendment similarly provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself[.]" To protect those rights, as relevant here, a defendant's statements while in police custody are subject to suppression if they are the result of "interrogation" that occurs without *Miranda* warnings, *State v. Moeller*, 229 Or App 306, 310, 211 P3d 364 (2009), or after the defendant has invoked the right to counsel, *State v. Isom*, 306 Or 587, 592, 761 P2d 524 (1988).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 US 291, 301, 100 S Ct 1682, 1689-90, 64 L Ed 2d 297 (1980) (emphasis added)). The same is true under Article I, section 12. *State v. Cunningham*, 179 Or App 498, 501, 40 P3d 535, *rev den*, 334 Or 327 (2002) (adopting federal definition of "interrogation" for the purposes of Article I, section 12). As the italicized language above suggests, questions that are "normally attendant to arrest and custody—*i.e.*, questions that serve a noncriminal, noninvestigatory purpose"—are not considered "interrogation" for *Miranda* purposes. *State v. Lanier*, 290 Or App 8, 12, 413 P3d 1020 (2018). That is commonly known as the "booking question" exception. *State v. Fink*, 285 Or App 302, 307, 395 P3d 934 (2017).[5]

Routine booking questions, such as questions seeking biographical data necessary to complete booking or pretrial services, are not considered interrogation *even if* they

---

[5] Defendant cites both Article I, section 12, and the Fifth Amendment, but he has not identified any significant differences between the state and federal constitutional provisions as relevant to the booking question exception. Consistently with the authorities cited by the parties in their briefs, we focus on our caselaw under Article I, section 12, but we reach the same conclusion under the Fifth Amendment.

are reasonably likely to elicit incriminating information. *Lanier*, 290 Or App at 12-13. However, that does not mean "'that any question asked during the booking process falls within th[e] exception.'" *Cunningham*, 179 Or App at 504 (quoting *Pennsylvania v. Muniz*, 496 US 582, 602 n 14, 110 S Ct 2638, 110 L Ed 2d 528 (1990)). "Although the exception for questions normally attendant to arrest and custody may include questions that are reasonably likely to elicit an incriminating response," the exception does "not give officers *carte blanche*." *Id*. at 503-04 (quoting *Muniz*, 496 US at 602 n 14). Questions *designed* to elicit incriminating information constitute interrogation, regardless of whether they are routine booking questions. *Lanier*, 290 Or App at 12. That is, for the booking question exception to apply, a question must be normally attendant to arrest and custody *and* "not designed" to elicit incriminating information, even if it is reasonably likely to do so. *Moeller*, 229 Or App at 310-11.

A question is "designed" to elicit an incriminating response if the officer subjectively intended to elicit an incriminating response, *Lanier*, 290 Or App at 13, *or* if the question, "by its very nature, evidences an investigatory purpose and is therefore 'designed' to elicit incriminating information," *id*. at 15. An officer's subjective intent is a fact question, and, in this case, the trial court's finding that Ganci did not subjectively intend to elicit incriminating responses is supported by constitutionally sufficient evidence and therefore binding. *Moeller*, 229 Or App at 312. As for whether Ganci's questions were designed by their very nature to elicit incriminating information, we agree with the trial court that they were not.

In *Moeller*, a jail deputy asked the defendant during booking if she had any medical issues, and she included in her answer that she had recently used cocaine. 229 Or App at 308. Applying the booking question exception, we affirmed the trial court's denial of the defendant's motion to suppress that statement, because "[a] question about whether a detainee has a medical condition serves a standard administrative purpose, that is, to provide the police with the information necessary to attend to the detainee's medical needs while in police custody." *Id*. at 312-13. The question

was not designed to elicit an incriminating response, even though it could and, in fact, did. *Id.* at 312.

In this case, Ganci asked defendant about his physical condition at four points in time during his arrest and booking, including asking if he was injured in any way, why his head hurt, if he needed medical attention, if he needed looser handcuffs, whether he was "still doing okay," why his ankle hurt, and what his pain level was:

- Immediately upon taking defendant into custody, Ganci asked defendant if he was "injured in any way." Defendant responded that he was sore all over his body, legs, and shoulders, and that his "head hurt[] pretty bad." Ganci asked why his head hurt. After defendant responded, Ganci asked if he needed medical attention. Ganci also asked if he needed looser handcuffs given his shoulder pain.

- About halfway into a 50-minute drive to the jail, Ganci asked defendant "if he was still doing okay." He then asked again whether defendant needed medical attention.

- At the jail, defendant spontaneously told Ganci that his ankle hurt. In response, Ganci asked why or what was wrong with it.

- While defendant was photographed at the jail, Ganci asked him "if he was still doing okay." Ganci also asked him what his pain level was on a scale of 0 to 10.

Those type of questions serve a "standard administrative purpose, that is, to provide the police with the information necessary to attend to the detainee's medical needs while in police custody." *Moeller*, 229 Or App at 312-13. Ganci testified that he always asks medical questions to aid in determining whether an arrestee needs to go to the hospital instead of the jail, to avoid the arrestee having a medical emergency during transport, and because the jail will not take custody of someone who is in substantial pain or needs medical care. Ganci further testified that he provides any medical information that he receives to the jail,

as he did in this case. On the whole, and on that record, Ganci's questions were reasonably related to police administrative concerns regarding defendant's medical condition at the time of arrest and booking. Ganci's one or two follow-up questions about "why" something hurt presents the closest issue, because of the potentially ambiguous nature of a "why" question, but we ultimately agree with the trial court that, in context, even those one or two questions were not designed to elicit an incriminating response.

It is true, as defendant points out, that Ganci suspected or believed that defendant had been in a serious car crash 24 hours earlier, and defendant was arrested in connection with that crash. That suspicion or belief may have increased Ganci's concern about defendant's medical condition, but we reject the notion that an officer must refrain from asking routine arrest and booking questions about a person's medical condition if the officer has reason to believe that the person may have injuries related to a crime. If anything, having reason to believe that a person *is* injured or *is* suffering a medical condition makes it more important from an administrative perspective to determine the nature and severity of the injury or condition before placing the person in jail. To illustrate, if a person is arrested under circumstances suggesting that he or she may have been shot, an officer who would normally ask about injuries or medical conditions during arrest and booking is not precluded from doing so because the person might have a crime-related gunshot wound. Here, Ganci's recognition that defendant might have injuries related to the car crash did not preclude him from asking questions normally attendant to arrest and booking that served reasonable administrative purposes.

Relatedly, once Ganci knew that defendant was injured—because defendant told Ganci early in his arrest that he was sore all over his body, legs, and shoulders and that his head "hurt[] pretty bad," and because Ganci saw defendant limping and could see that he was in pain—Ganci was not precluded from asking defendant occasionally during the arrest and booking process if he was "still doing okay" or from confirming that he still did not want medical treatment.

The trial court did not err in denying defendant's motion to suppress his statements to Ganci on the night of his arrest.

Affirmed.